[Cite as *State v. Spradlin*, 2017-Ohio-630.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-05-026 |
| | : | O P I N I O N |
| - vs - | | 2/21/2017 |
| | : | |
| RYAN SPRADLIN, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2016 CR 0023

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for plaintiff-appellee

The Farrish Law Firm, Michaela M. Stagnaro, 810 Sycamore Street, 6th Floor, Cincinnati, Ohio 45202, for defendant-appellant

**RINGLAND, J.**

{¶ 1}  Defendant-appellant, Ryan Spradlin, appeals his conviction in the Clermont County Court of Common Pleas for felonious assault.  For the reasons detailed below, we affirm.

{¶ 2}  At trial, Michelle Jesse testified that she lived in the same apartment building as Spradlin, his wife Tia, and their children.  In the early morning hours of January 3, 2016, she

and her friend Donna Lowery were outside Jesse's apartment, smoking. They heard loud music coming from the Spradlins' apartment. Jesse then started to hear "a lot of screaming, hollering, yelling, thump, thump, thump, a lot of noises." She heard Tia yell "help, help." Lowery also heard a woman's voice calling for help.

{¶ 3} Jesse called 9-1-1 and told the dispatcher "I need the police here right away * * * [h]e's beating the hell out of this lady downstairs." The dispatcher asked her if she could see what was happening and she responded, "No, I can hear it. Oh, my God, you've got to hurry."

{¶ 4} Amelia Village Police Officer Saylor responded to the scene about two minutes after being dispatched, or about 1:44 a.m. He approached the Spradlins' front door and listened. He heard a female voice say "stop, get away from me" several times and then "help me." Saylor announced himself and began knocking. He then heard "please help me, he's going to kill me."

{¶ 5} Saylor started kicking the door in an attempt to open it. After a number of unsuccessful kicks, Saylor heard Spradlin say "hey, I got kids in here, man." Spradlin then opened the door. From his vantage, Saylor could see into the bathroom and observed Tia sitting on the bathtub. Her face was black and blue, and bloody. She was crying.

{¶ 6} Officer Saylor saw blood on Spradlin's hand. He ordered Spradlin to the ground, who complied. Saylor handcuffed Spradlin and immediately took him out to a police car.

{¶ 7} Meanwhile, Jesse and Lowery entered the Spradlins' apartment. Jesse went to check on the Spradlins' children and Lowery went to see Tia in the bathroom. Lowery observed that Tia's mouth was bleeding, she had teeth missing, and her left eye was swollen shut. Crying, Tia told Lowery that Spradlin had accused her of cheating and he assaulted her so that she "wouldn't be pretty anymore." Lowery said that Tia appeared to be intoxicated.

{¶ 8} Officer Saylor returned from the police car and spoke with Tia. Saylor described her demeanor as "very upset, crying, shaking. She was struggling to – to put her thoughts together * * *." He asked her if she was okay. She responded, "he was going to kill me." Saylor noticed that there was water in the bathtub and asked her what it was for. She said, "I think he was going to drown me." She said that Spradlin punched her and kicked her in the head and face and that he knocked her teeth out.

{¶ 9} Saylor spoke with Spradlin and asked what happened. Spradlin said that Tia fell in the bathroom. He said he cut his hand by punching the front door, which was made of steel.

{¶ 10} Saylor took photographs of the apartment about ten minutes after he arrived on scene, which the state entered into evidence. Some photographs depict the living room, in which various small items are strewn chaotically about the floor of the living room. There are photographs of two of Tia's dislodged teeth, which were dental implants. These were located by police on the floor of the living room. Another photograph depicts a fist-sized hole punched into a door. Saylor testified that the hole was on the exterior of the bathroom door.

{¶ 11} Adam Dressler, a paramedic with the Union Township Fire Department, treated Tia at the apartment and on an ambulance ride to the hospital. She was "frantic, irate," and "very upset." Tia repeatedly told Dressler that Spradlin "knocked my fucking teeth out," and that Spradlin punched her repeatedly and choked her. She said that Spradlin turned the shower on to cover the sound of her screaming. She said he was "going to make her so she wouldn't be pretty" and that she told him it would not matter if he did because she had a good personality. Spradlin responded, "I'll just fucking kill you."

{¶ 12} Doctor Adam Kennah, an emergency medical physician, provided medical treatment to the Spradlins at the hospital. Tia told Dr. Kennah that Spradlin choked and punched her repeatedly. She said that she felt pain around her eye and was only seeing

black and white out of both eyes. Dr. Kennah diagnosed her with a traumatic orbital hematoma (bruising at the eye). Dr. Kennah opined that it would take two to three weeks for the swelling around the eye to dissipate. The doctor also noted that Tia had fractured dental implants, which would require a dentist to assess for treatment. Tia also suffered a closed head injury (a concussion with no disruption of the skull). Finally, Dr. Kennah observed multiple contusions or bruises, including bruising on her shoulder blade, left arm, and around her neck.

{¶ 13} Dr. Kennah opined that Tia's injuries were consistent with being choked and repeatedly punched. Dr. Kennah further opined that Tia's injuries were not consistent with a "low level" fall, i.e., a fall from standing height. Dr. Kennah said that he would not expect to see such traumatic injuries from a low level fall unless the injured person was elderly.

{¶ 14} Dr. Kennah said that Spradlin told him that the laceration on his knuckle resulted from him punching a wall and then catching it on a piece of metal while drawing his hand back. Nonetheless, Dr. Kennah said that he treated Spradlin as if the laceration was the result of being cut by teeth.

{¶ 15} Spradlin testified. He said that on the night of January 2 he and his wife began drinking and smoking marijuana after they put their children to sleep. As the night progressed, Tia became increasingly intoxicated and angry. She began screaming at him. In response, he walked out onto his apartment patio to smoke a cigarette. Then he heard a "deadly" and "nonstop" scream coming from inside the apartment

{¶ 16} Spradlin ran back into the apartment and found Tia in the bathroom, face down on the floor. She was still screaming, and he rolled her onto her back. He noted that she had a black eye and there was blood on her lips. He saw her four "crowns," or dental implants, on the bathroom floor.

{¶ 17} He observed a wall-mounted towel rack in the bathroom that was now laying

- 4 -

on the floor. He said that earlier in the night he had been bathing his children, they were splashing, and there was water on the floor.

{¶ 18} Spradlin said that as he was attempting to calm his screaming wife he began to panic. He got up from the bathroom floor and started crying. He went out to the living room area and grabbed his hair. He punched the front door of the apartment and cut his hand on the metal hinge. Spradlin testified that he was left-handed.

{¶ 19} He went back into the bathroom. Tia was laying on her stomach again. He rolled her over once more. She was still very upset. At that point, he heard someone knocking on the door.

{¶ 20} The knocking became louder. Spradlin looked through the door's peephole and saw that it was an Amelia Village police officer. The Spradlins' five-year-old child was walking around the apartment by now, apparently awakened by Tia's screams. Spradlin told the police officer that "I have children in here" and asked the police officer to wait. He carried the child to her bed and then returned to the door and opened it. Officer Saylor ordered him to the ground and he complied.

{¶ 21} On cross-examination, Spradlin said that Officer Saylor was lying about where the fist-sized hole in the door was located. Spradlin said that the photograph actually depicted a hole in his bedroom door, which had been there for some time. Spradlin also said that all of the debris on the floor of living room was not there when he was arrested. He could not explain who caused the mess.

{¶ 22} The case went to the jury, who deliberated for a day. Several hours after deliberations began, the jury sent a note to the trial court indicating that they were deadlocked, that they had discussed the case in great detail and voted twice but it was obvious after their discussions that no one was wavering on their opinion or changing their vote. The court read the jury an instruction encouraging them to continue their deliberations

in an effort to reach a verdict.

{¶ 23} Later, the jury sent the court a note indicating that they were still deadlocked. The court asked for counsel to convene to discuss this second note. However, before the court and counsel could meet, the jury sent a third note indicating that they were making progress towards a verdict and wished to continue deliberating.

{¶ 24} The jury ultimately rendered a guilty verdict. At sentencing, the court imposed a prison term of three years. Spradlin presents five assignments of error for review.

{¶ 25} Assignment of Error No. 1:

{¶ 26} THE TRIAL COURT ERRED AS A MATTER OF LAW BY ALLOWING THE STATE TO INTRODUCE HEARSAY STATEMENTS WHICH VIOLATED APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL.

{¶ 27} Spradlin argues the court erred in admitting Tia's various out-of-court statements, i.e., yelling for help, identifying him as her attacker, and alleging how she was attacked. Spradlin argues that these statements were hearsay and not otherwise admissible. The state argues that Tia's out-of-court statements were either not hearsay, or were admissible as exceptions to the hearsay rule, i.e., excited utterances or statements for the purpose of medical diagnosis or treatment. Spradlin further argues that the state's use of Tia's out-of-court statements, and his inability to cross-examine her, violated his rights under the Confrontation Clause.

{¶ 28} Spradlin concedes that he did not object to any of the statements he now contends were erroneously admitted. Therefore, on appeal, he has waived any error except plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Plain error does not exist unless, but for the error, the outcome of the trial would have been different. *State v. Blacker*, 12th Dist. Warren No. CA2008-07-094, 2009-Ohio-5519, ¶ 39.

Directives

**{¶ 29}** Jesse, Lowery, and Officer Saylor testified that they heard Tia yelling "help" or "help me." Tia's yells for assistance are not hearsay. Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" is defined for hearsay purposes, as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid.R. 801(A).

**{¶ 30}** "Help" and "help me" are not hearsay because they are directives and are not "assertions." See *State v. Richardson*, 12th Dist. Clermont Nos. CA2014-03-023, CA2014-06-044 and CA2014-06-045, 2015-Ohio-824, ¶ 47. An "assertion" for hearsay purposes simply means to say that something is so, e.g., that an event happened or that a condition existed. *Id.* A directive, like a yell for help, is not an assertion because it is incapable of being proved either true or false. Therefore, a directive cannot be offered to prove the truth of the matter asserted. *Id.* Accordingly, the court did not err in admitting this testimony.

Excited Utterances

**{¶ 31}** Spradlin contends that Tia's statements to Lowery and Officer Saylor identifying Spradlin as her attacker, the mechanism of his attack, and the purpose behind the attack (so she "wouldn't be pretty anymore") were inadmissible hearsay. Spradlin argues that these statements were not admissible as excited utterances because they were the product of reflection and not impulse.

**{¶ 32}** Evid.R. 803(2) provides a hearsay exception for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The controlling factor in analyzing whether a statement is an excited utterance is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection. *State*

*v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 27. In *Knecht*, this court concluded that the trial court properly admitted hearsay statements where two police officers testified that a domestic violence victim was "crying, very upset, emotional, distraught" when they first spoke with her. *Id.* at ¶ 28. The police also observed injuries on the victim's head and face. *Id.* at ¶ 5.

{¶ 33} We conclude that the trial court did not err in allowing Lowery and Officer Saylor to testify as to Tia's statements inculpating Spradlin. The evidence showed that Jesse called 9-1-1 soon after the assault began. Officer Saylor responded within two minutes of being dispatched. When he arrived, Tia was still pleading for help.

{¶ 34} Spradlin opened the apartment door and Officer Saylor could see that Tia was injured. Saylor restrained Spradlin without incident and took him to his police car. He returned immediately to check on Tia. Meanwhile, Lowery entered the apartment and spoke with Tia. She found Tia on the bathroom floor, badly injured and crying. When Office Saylor returned and encountered Tia he described her as "very upset, crying, shaking" and "struggling to – to put her thoughts together." Officer Spradlin asked Tia if she was "okay." It is not clear if she understood the question because she responded, "he was going to kill me."

{¶ 35} We conclude these facts demonstrate that Tia's statements to Lowery and Officer Saylor resulted from impulse and the stress of the situation and not reason and reflection. Accordingly, we conclude that the court did not err in admitting Tia's out-of-court statements testified to by Lowery and Officer Saylor.

{¶ 36} We further conclude that Tia's statements to Dressler were also admissible as excited utterances. Dressler testified that he arrived on scene eleven minutes after Officer Saylor arrived. When he encountered Tia she had moved from the bathroom to her bed, but was still "screaming," "frantic, irate" and "very upset." She remained "wound up" on the ambulance ride to the hospital as she continued making statements inculpating Spradlin.

Statements for Purposes of Medical Diagnosis or Treatment

{¶ 37} Spradlin argues that the court erred by allowing Dressler and Dr. Kennah to testify as to Tia's statements inculpating Spradlin. Spradlin contends that these statements were not admissible under the statements made for the purpose of medical diagnosis or treatment exception to the hearsay rule.

{¶ 38} Evid.R. 803(4) provides as follows: "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." However, statements identifying an assailant are not properly admissible under Evid.R. 803(4) absent some evidence that the identity of the perpetrator is reasonably pertinent to diagnosis or treatment. *State v. Shouse*, 12th Dist. Brown No. CA2013-11-014, 2014-Ohio-4620, ¶ 22; *State v. Kingery*, 12th Dist. Fayette No. CA2009-08-014, 2010-Ohio-1813, ¶ 34.

{¶ 39} Dressler and Dr. Kennah summarized their procedures for assessing a patient. Dressler testified that he would take a medical history from the patient, so as to get a "baseline for what their medical problems are, anything else we need to look for * * *." In other words, "basically what led up to the event, why we are here." Dr. Kennah performed his medical assessment with the goal to determine "the possible extent of the injuries." Accordingly, he would question his patient to determine "the mechanism of how they were injured so I can decide possibly how badly they were injured, and what needed to be examined or studied."

{¶ 40} The evidence indicated that Dressler and Dr. Kennah provided medical diagnosis or treatment to Tia for her physical injuries sustained in the attack. After thoroughly reviewing the record, we can find no evidence indicating that the identification of Tia's attacker was reasonably pertinent to a medical professional's diagnosis or treatment.

Accordingly, those portions of Tia's out-of-court statements made to Dressler and Dr. Kennah which identified Spradlin as her attacker were not admissible under Evid.R. 803(4).[1]

{¶ 41} Nonetheless, the admission of these statements does not rise to the level of plain error for several reasons. First, we have already concluded that Tia's statements to Dressler were admissible on other grounds, i.e., as excited utterances. Second, Tia's statements to Dr. Kennah were largely if not entirely cumulative of testimony we have also determined was admissible, i.e., the testimony of Lowery, Officer Saylor, and Dressler. This court will not find plain error where erroneously admitted evidence is largely cumulative of other, properly admitted evidence, and where the other properly admitted evidence amply demonstrated a defendant's guilt. *Shouse*, 2014-Ohio-4620 at ¶ 23. Spradlin has therefore failed to show that the outcome of his trial clearly would have been different but for the error, and he cannot prevail on his plain error claim.

### Confrontation Clause

{¶ 42} Spradlin argues that the admission of Tia's out-of-court statements through the testimony of Dressler and Officer Saylor violated his Confrontation Clause rights because he did not have the opportunity to cross-examine her at trial.

{¶ 43} The Confrontation Clause as found in the Sixth Amendment to the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him." To that end, the Confrontation Clause bars the admission of "testimonial hearsay" unless the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. *Knecht*, 2015-Ohio-4316, at ¶ 21. They key issue, therefore, is whether the statement was "testimonial." *Id.*

{¶ 44} The United States Supreme Court found testimonial statements existed where

---

1. This is not to say that the identity of Tia's attacker was not relevant to diagnosis or treatment. There simply is insufficient evidence in *this* record to permit us to reach that conclusion.

there was no ongoing emergency and the statements resulted from a police interrogation whose "'primary purpose [was] to establish or prove past events potentially relevant to later criminal prosecution.'" *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 17, quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266 (2006). However, as the United States Supreme Court further explained, "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." *Michigan v. Bryant*, 562 U.S. 344, 374, 131 S.Ct. 1143, (2011). (Emphasis sic.) Rather, in making this "primary purpose" determination, courts must consider "all of the relevant circumstances." *Id.* at 369. In other words, "whether an ongoing emergency exists is simply one factor – albeit an important factor – that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 366.

{¶ 45} Another factor to be considered in determining the "primary purpose" of an interrogation is the formality of the situation. *Ohio v. Clark*, ___ U.S. ___, 135 S.Ct. 2173, 2180 (2015). For instance, while a "formal station-house interrogation" is more likely to provoke testimonial statements, "less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Id.* The standard rules of hearsay, designed to identify some statements as reliable, are also relevant when determining whether a statement is testimonial. *Id.* The same is true regarding "the statements and actions of both the declarant and interrogators" for this "provide[s] objective evidence of the primary purpose of the interrogation." *Bryant* at 367. In the end, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark* at 2180, quoting *Bryant* at 358. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*, quoting *Bryant* at 359.

{¶ 46} Spradlin argues that Tia's statements to Officer Saylor and Dressler were

testimonial because they were in response to questioning and further, that that there was no ongoing emergency because Officer Saylor had already restrained him by the time Tia made the statements. After thoroughly reviewing the record, we conclude that Tia's statements to Officer Saylor and Dressler were nontestimonial.

{¶ 47} As the record reflects, Tia's statements to Officer Saylor inculpating Spradlin occurred only minutes after Saylor arrived on scene and while there was an ongoing emergency. By that time the focus of the emergency had shifted from stopping an assault to determining the appropriate medical response for Tia's care. That Spradlin had been restrained did not terminate the urgency of making the appropriate medical decision for Tia's injuries.

{¶ 48} Moreover, Officer Saylor did not ask Tia a question one would expect in a formal police interrogation. He asked her if she was okay. This question was consistent with Officer Saylor's trial testimony that when he first interacted with Tia he was attempting to assess her need for emergency medical assistance. In other words, we do not believe that Officer Saylor was attempting to question Tia in an effort to create a substitute for her testimony at trial.

{¶ 49} We further find that the statements Tia made to Dressler also do not implicate the Confrontation Clause because the primary purpose of Dressler's questioning was to obtain an accurate medical history and then to provide appropriate treatment at the apartment and while traveling to the hospital. Dressler testified that his job as a paramedic was not to investigate the scene or necessarily determine what caused the injury, but to give the person treatment as quickly as possible. Accordingly, we find Tia's statements to Dressler and Officer Saylor were nontestimonial and thus do not implicate Spradlin's rights under the Confrontation Clause. This assignment of error is meritless.

{¶ 50} Assignment of Error No. 2:

{¶ 51} THE TRIAL COURT ERRED AS A MATTER OF LAW BY PERMITTING TIA SPRADLIN TO ASSERT A FIFTH AMENDMENT RIGHT NOT TO TESTIFY OUTSIDE THE PRESENCE OF THE JURY WHICH VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL.

{¶ 52} The state subpoenaed Tia to appear at trial and give testimony. Tia appeared with counsel, who informed the court that Tia intended to invoke her Fifth Amendment right to remain silent if asked any questions about what happened on January 3, 2016. At the state's request, and with no objection from Spradlin, the state questioned Tia outside of the presence of the jury. She answered several preliminary questions, i.e., her name, address, and relationship to Spradlin. When the state asked what happened between her and Spradlin the morning of January 3, she responded that she was "pleading the fifth."

{¶ 53} The court then announced that there was the possibility that her answers, depending on what they were, could incriminate her, and that she had the right to exercise her rights under the Fifth Amendment. Spradlin's counsel did not object and furthermore indicated they had no other questions of Tia. Accordingly, the court excused Tia from testifying.

{¶ 54} Later in the trial, while discussing jury instructions with counsel, the court made some comments reflecting its lack of understanding of Tia's motivation to assert her Fifth Amendment rights:

> So, Tia Spradlin has not testified, and she has taken the 5th Amendment. And she may be not testifying because she doesn't want to testify against her husband. She may be test – may not be testifying because she doesn't want to provide evidence that would help convict him. She may be testifying – not testifying because she lied in the statement she made. She may not be testifying because she committed a crime of her own. I mean, there are all kinds of possibilities. *It would be speculation to suggest why – what her testimony would have been if she had testified, and why she has chosen not to testify.*

(Emphasis added.)

{¶ 55} Spradlin argues that the court committed plain error by failing to conduct a colloquy to determine if Tia had a proper basis to invoke her rights under the Fifth Amendment. Spradlin concedes that he is limited to a review for plain error because he did not object. However, he argues that the outcome of the trial could have been different had Tia been required to testify. He contends that his conviction was premised entirely on Tia's out-of-court statements. So if he had had the opportunity to cross-examine her at trial, Tia may have contradicted her out-of-court statements or corroborated his version of events.

{¶ 56} In *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, the Ohio Supreme Court addressed the responsibility of the trial court in a situation where a witness refuses to testify on the basis of the Fifth Amendment. The court noted that the proponent of the privilege bears the burden of demonstrating that he or she is "faced with some authentic, objectively reasonable danger of incrimination." *Id*. at ¶ 44. To this end, the trial court has the "critical" responsibility to inquire "into the basis of a witness's assertion of the privilege * * * even when the purported basis seems implausible, frivolous, or suspect." *Id*. at ¶ 47. In other words, "[a] trial court must ensure that the proponent of the privilege provides the basis for asserting the privilege and evidence to support that claim * * *." *Id*. at ¶ 46.

{¶ 57} After reviewing the record, we find that the trial court failed to conduct the inquiry mandated by *Arnold*. While we agree that this was error, we do not find that it rises to the level of plain error.

{¶ 58} This court cannot say that but for the trial court conducting the proper *Arnold* colloquy the outcome of the trial would have been different. As the trial court noted, Tia could have invoked the privilege for any number of reasons, including reasons which would not have been proper (e.g., because she intended to perjure herself). Accordingly, there is no evidence from which we could determine whether the trial court would have permitted her to exercise her Fifth Amendment right or ordered her to answer the state's questions.

{¶ 59}   Assuming the court ordered her to testify, it would be yet another leap for us to speculate as to the content of her testimony.  Spradlin argues that she "could" have testified favorably for him.  However, she could have done the opposite.  As such, Spradlin cannot demonstrate that there would have been a different result at trial but for the court's failure to conduct the *Arnold* colloquy.

{¶ 60}   Moreover, we do not agree with Spradlin's argument that his conviction was based entirely on Tia's out-of-court statements.  As we will discuss below, even if we excluded all of Tia's statements inculpating Spradlin, the state produced other evidence, both direct and circumstantial, which supported Spradlin's conviction.  Accordingly, this court concludes that Spradlin has not demonstrated plain error and this assignment of error is meritless.

{¶ 61}   Assignment of Error No. 3:

{¶ 62}   THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT.

{¶ 63}   Spradlin argues that his conviction for felonious assault was against the manifest weight of the evidence because the state failed to prove that he was the perpetrator of the assault.  He argues that he was the only witness at trial who had first-hand knowledge of what occurred inside the apartment and his version of events was consistent with the evidence.  He separately argues that the state failed to prove that Tia suffered "serious physical harm."

{¶ 64}   When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court's function is to examine the evidence admitted at trial to determine whether such evidence, viewed in a light most favorable to the prosecution, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  *State v.*

*Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 17.

**{¶ 65}** In determining whether a judgment is against the manifest weight of the evidence, an appellate court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Cooper*, 12th Dist. Butler No. CA2010-05-113, 2011-Ohio-1630, ¶ 7. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶ 66}** The jury found Spradlin guilty of felonious assault, a violation of R.C. 2903.11(A)(1), which prohibits causing "serious physical harm" to another. After thoroughly reviewing the record, we conclude that the manifest weight of the evidence supported Spradlin's conviction. Two disinterested witnesses, Jesse and Lowery, testified that they heard screaming and pleas for help coming from the apartment that Spradlin shared with his wife and children. Officer Saylor also heard Tia yelling for help. Once Officer Saylor opened the door he, Jesse, and Lowery observed Tia suffering from injuries consistent with what Jesse told the police dispatcher she thought was occurring, i.e., domestic violence.

**{¶ 67}** Shortly after the attack, Tia identified Spradlin as her attacker to three witnesses and consistently told them that Spradlin choked and repeatedly punched her. She repeated these allegations to Dr. Kennah, who said that she suffered consistent injuries. Moreover, Dr. Kennah opined that Tia's injuries were inconsistent with a low-level fall, i.e., the only theory that Spradlin advanced to explain the origin of the numerous injuries suffered by his wife that morning. Finally, Spradlin's injury on the knuckle of his dominant, left hand was consistent with his having "knocked" out his wife's dental implants.

{¶ 68} The jury did not believe Spradlin's version of events and we generally defer to the factfinder on matters of witness credibility. *State v. Andrews*, 12th Dist. Butler No. CA2009-02-052, 2010-Ohio-108, ¶ 46. Spradlin's testimony was also, at times, difficult to believe. For instance, despite the photographic evidence to the contrary, Spradlin denied that the living room had any debris strewn about it. He could not explain why or how someone would "stage" the photograph. There is nothing in the record that would make us second guess the jury's decision in this case.

{¶ 69} This court also finds that the manifest weight of the evidence supports the jury's finding that Spradlin caused Tia "serious physical harm." In pertinent part, the Revised Code defines "serious physical harm" as: "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement". R.C. 2901.01(A)(5)(c) and (d).

{¶ 70} Tia received emergency medical treatment for several fractured dental implants, a concussion, significant bruising and swelling around her eye, and bruising on various parts of her body, including around her neck where she alleged Spradlin choked her. With respect to her fractured dental implants, Dr. Kennah testified that she would have to see a dentist. Dr. Kennah also testified that it would take several weeks for the swelling around Tia's black eye to reduce completely. Tia reported pain around her eye and that she could not see color out of either eye.

{¶ 71} The state introduced numerous photographs into evidence that graphically depicted Tia's injuries, which were taken at both the apartment and hospital. The photographs depict the significance of the swelling around her eye, her missing dental implants, and the numerous bruises covering Tia's body. We conclude that the evidence presented at trial demonstrated serious physical harm under both R.C. 2901.01(A)(5)(c) and

- 17 -

(d), i.e., physical harm involving temporary, substantial incapacity, and permanent and temporary disfigurement.

{¶ 72} Accordingly, we find that Spradlin's felonious assault conviction is not against the manifest weight of the evidence. Our determination that Spradlin's conviction is supported by the weight of the evidence is also dispositive of the issue of sufficiency. *State v. Rodriguez*, 12th Dist. Butler No. CA2008-07-162, 2009-Ohio-4460, ¶ 62. This assignment of error is meritless.

{¶ 73} Assignment of Error No. 4:

{¶ 74} THE TRIAL COURT ERRED BY GIVING A *HOWARD* CHARGE TO THE JURY AFTER ONLY SEVERAL HOURS OF DELIBERATION AND ON MORE THAN ONE OCCASION.

{¶ 75} A *Howard*[2] charge is a jury instruction designed to be given to a jury that believes it is deadlocked in order to "challenge [the jury] to try one last time to reach a consensus." *State v. Robb*, 88 Ohio St.3d 59, 81 (2000). The charge is set forth in Ohio Jury Instructions, CR Section 429.09.

{¶ 76} The jury deliberated for one day. After several hours of deliberation, the jury sent a note to the court indicating that it was deadlocked.[3] The court then provided the jury with the *Howard* charge and sent it back to attempt more deliberations. Later the same day, upon the jury's request, the court provided it with a copy of the *Howard* charge in audio and written formats.

{¶ 77} Spradlin contends that the court erred in giving the *Howard* charge so early into the deliberations and erred again when it gave the charge to the jury a second time.

---

2. *State v. Howard*, 42 Ohio St.3d 18 (1989).

3. The record does not reflect the timing of any event with respect to this assignment of error. However, the state did not dispute Spradlin's claim that the jurors deliberated for "several hours" before indicating a deadlock.

Spradlin concedes that he did not raise this objection at trial and thus has waived all but plain error. We find that the court did not commit any error, plain or otherwise.

{¶ 78} Spradlin provides no authority or rationale for the argument that a court must wait a certain time before providing a *Howard* charge to a jury who announces it is deadlocked. Nor does Spradlin provide any authority for the argument that it is error to provide a jury with an audio or written form of the *Howard* charge. Essentially, Spradlin is implying that the *Howard* charge is coercive and compelled an otherwise deadlocked jury to render a verdict against him. We disagree.

{¶ 79} The *Howard* charge is intended to encourage jurors to reach a verdict and to appreciate opposing viewpoints, whether they be for a finding of guilt or acquittal. The charge is carefully drafted to avoid suggesting what verdict would be preferable. Moreover, the Supreme Court of Ohio has found that a *Howard* charge is not coercive and has repeatedly approved its use. See *State v. Brown*, 100 Ohio St.3d 51, 60 (2003). Accordingly, we find no error in the trial court's discretionary decision to provide the *Howard* charge at the time it did.

{¶ 80} We also conclude that the court committed no error, much less plain error, when it provided jurors with a written and audio copy of the *Howard* charge after they requested it. Crim.R. 30(A) provides: "[t]he court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record." Accordingly, the jury was entitled to a written or audio copy of the instructions and there is no error here.

{¶ 81} Spradlin also argues that the court erred by allowing the jury to continue to deliberate after sending a second note indicating that it remained deadlocked. The note reads as follows:

We have absolutely no change to opinions of guilt, not guilty.
Three more hours of deliberations, we are deadlocked at present.

Later, the jury sent another note indicating it was making progress and wished to continue deliberations. Ultimately, the jury rendered a verdict.

{¶ 82} Again, the record is not clear as to timing of these events. According to the state's brief, the court received the second note from the jury and asked counsel to convene to discuss it. Before counsel could convene, the jury sent the third note indicating it was making progress towards a verdict and wished to continue deliberations.

{¶ 83} Whether a jury is irreconcilably deadlocked is a "necessarily discretionary determination" for a trial court to make based on the specific circumstances of each case. *Brown*, 100 Ohio St.3d at 60, quoting *Arizona v. Washington*, 434 U.S. 497, 510, 98 S.Ct. 824 (1978), fn. 28. Spradlin's argument appears to be that the court should have immediately found that the jury was deadlocked and declared a mistrial upon receipt of the second note. We disagree. This is a matter ordinarily left to the sound discretion of the trial court and we perceive no abuse of discretion in asking counsel to convene to discuss the note. We also interpret the note as updating the court on the current status of deliberations and not a statement that further deliberations would be entirely fruitless. We believe the court took the appropriate step in asking counsel to convene to discuss the issue. In the interim, the jury began making progress and ultimately rendered a verdict. There is no plain error here and this assignment of error is meritless.

{¶ 84} Assignment of Error No. 5:

{¶ 85} APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS THUS PREJUDICING HIS RIGHT TO A FAIR TRIAL.

{¶ 86} Spradlin argues that his trial counsel was ineffective for failing to object to: (1)

Tia's out-of-court statements, (2) Tia asserting her Fifth Amendment right, and (3) the court providing the *Howard* charge more than once.

{¶ 87} Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Hendrix*, 12th Dist. Butler No. CA2012-05-109, 2012-Ohio-5610, ¶ 14. To prevail on an ineffective assistance of counsel claim, Spradlin must show his trial counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984).

{¶ 88} In order to demonstrate prejudice, Spradlin must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of trial would have been different. *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 42. A "reasonable probability" is a probability that is "sufficient to undermine confidence in the outcome." *Strickland* at 694. The failure to make an adequate showing on either prong is fatal to an ineffective assistance of counsel claim. *Kinsworthy* at ¶ 42.

{¶ 89} Spradlin cannot demonstrate ineffective assistance of counsel with respect to failing to object to Tia's out-of-court statements that we have already concluded were admissible as nonhearsay or excited utterances. Counsel cannot be ineffective for failing to object to admissible evidence. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 218. Even if we presumed that the failure to object to hearsay that was admitted in error constituted deficient representation, Spradlin cannot establish that he was prejudiced. As we earlier concluded, any erroneously admitted statements were largely if not entirely cumulative of other, properly admitted evidence.

{¶ 90} Spradlin cannot demonstrate ineffective assistance of counsel with respect to his argument that counsel failed to object to Tia's assertion of her Fifth Amendment privilege. The decision to call or not call a witness is a strategic decision and we typically do not

second guess counsel strategy as a reviewing court. *State v. Johnson*, 12th Dist. Butler No. CA2011-09-169, 2013-Ohio-856, ¶ 56. Here, there was an obvious strategic reason not to object to the trial court's finding that Tia properly exercised her Fifth Amendment right, which is that her testimony could have been adverse to Spradlin. Accordingly, counsel was not deficient in this respect.

{¶ 91} Finally, Spradlin cannot demonstrate ineffective assistance for his counsel's failure to object to the *Howard* charge. We have concluded that the court did not err in the manner in which it gave the *Howard* charge, accordingly, counsel cannot be deficient for failing to object. This assignment of error is meritless.

{¶ 92} Appellant's five assignments of error are overruled. Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.