[Cite as *State v. Carpenter*, 2023-Ohio-2523.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | | |
| Appellee, | : | CASE NO. CA2022-02-005 | |
| - vs - | : | O P I N I O N <br> 7/24/2023 | |
| | : | | |
| KEITH M. CARPENTER, | : | | |
| Appellant. | : | | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 21-500-092

Rittgers & Rittgers, and Neal D. Schuett, for appellant.

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Katie Wilkin, Assistant Prosecuting Attorney, for appellee.

**BYRNE, J.**

{¶ 1} Keith M. Carpenter appeals from his convictions for multiple counts of rape and gross sexual imposition in the Clinton County Court of Common Pleas. For the reasons that follow, we affirm Keith's convictions.

**I. Facts and Procedural History**

{¶ 2} In April 2021, a Clinton County grand jury indicted Keith on 13 counts,

consisting of 11 counts of rape and two counts of gross sexual imposition ("GSI"). The indictments related to allegations that Keith repeatedly engaged in sexual conduct and sexual contact with his adopted minor children, "Kate" and "Danielle,"[1] between 2015 and 2020.

{¶ 3} Kate and Danielle are biological sisters. Kate is older than Danielle by 11 months. The indictments alleged that Kate was the victim in three counts of rape and one count of GSI for acts that occurred between 2015 and 2018, when Kate would have been between 10 and 14 years old. The indictments further alleged that Danielle was the victim of the remaining eight counts of rape and one count of GSI, which occurred between 2016 and 2020, when Danielle would have been between 11 and 15 years old.

{¶ 4} The matter proceeded to a jury trial. We summarize the trial testimony below.

## A. Kate's Testimony

{¶ 5} Kate testified that she was born in January 2004 and was 18 years old at the time of trial. She entered foster care beginning in 2007. Kate and Danielle were placed with Keith and Tammy Carpenter at an early age. The Carpenters quickly accepted them as daughters. They did things as a family. Kate grew to love the Carpenters, and she considered them her mom and dad.

{¶ 6} Kate recollected that during elementary school she would ride the bus home from school and Keith would be there. Tammy did not get off work until later. She and Keith would wrestle, which seemed normal. However, one time they were wrestling, and Keith held her down for longer than she felt was normal.

{¶ 7} Later, Keith asked her if she wanted him to teach her how to be a good kisser. He then kissed her longer than she thought a father should kiss a daughter. After this

---

1. For privacy and readability, we refer to the victims using fictious names.

incident, Keith began kissing her more often, in private. He also began touching her butt and commenting on her butt.

{¶ 8}  Kate testified that in the summer after sixth grade, she and Keith were at the Clinton County Fair, staying in the family's camper. Danielle was in the camper too, sleeping nearby. Keith told Kate to perform oral sex on him. She told him that she did not want to because it was gross. Keith put a sandwich bag over his penis and said, "now it's not gross because you won't actually be touching it." She still did not want to do it, but he made her do it anyway. She tried to be quiet while she was doing it, to protect Danielle from knowing and to keep it hidden.

{¶ 9}  Kate testified that she did not tell anyone about this incident and provided her reasons. First, Keith told her not to tell anyone. Second, by the time of the oral sex incident, the abuse had become normalized. Kate noted the progression from wrestling, to kissing, to touching, and that she was "used to it in a way." Third, it was embarrassing, and she was ashamed. Fourth, she did not know how the family would react if she disclosed the abuse. She specifically did not know how Danielle would react because she thought Danielle still viewed Keith as a great dad. Fifth, she was concerned that she might have to go back into foster care.

{¶ 10} Kate testified that sexual abuse happened repeatedly whenever the family went to the county fair. The summer after her eighth-grade year, Kate recalled that she, Danielle, and Keith were at the county fair. She did not have to show animals on Thursdays at the fair so Keith allowed her to have a friend over and allowed them to ride the fair rides. So, the night before, on Wednesday, her friend "Ella"[2] spent the night.

{¶ 11} That night, Keith provided alcohol to Kate, Danielle, and Ella. It was fruity

_____

2. Ella is a fictitious name.

alcohol like Redd's Apple Ale, strawberry daquiris, and vodka in red Solo cups. Keith encouraged all three girls to drink and to "touch and kiss and stuff." After they drank, Keith turned on music and had Kate "dirty dance" for him. Afterwards, all four went into the master bedroom and got into the same bed. Keith was with Danielle, but it was dark, and Kate was not sure what they did. Kate and Ella, prompted by Keith's "encourag[ing] us to touch and kiss and stuff," "experimented" with each other.

{¶ 12} Later that night, Ella began "freaking out" in the camper, crying and sobbing hysterically. Eventually she went to sleep. Kate found that Keith was sitting on a couch. She confronted him, and accused him of destroying her relationship with her best friend. Keith told Kate that all she had to do was convince Ella that it was a dream, and everything would be okay.

{¶ 13} In addition to abuse in the camper, Kate recalled abuse that occurred in the family home. During her middle school years, Kate recalled that Keith would have her take her clothes off and he would take his clothes off and, initially, it started with them "rubbing our parts together" without penetration. While these incidents eventually included penetration, she did not remember precisely when they progressed to include penetration because "it kind of just all bleeds together."

{¶ 14} Kate also recalled that during the summer after the first incident at the county fair, she and Danielle slept in a bedroom in a house that they moved to after the fall of her sixth-grade year. It was in June or July, before the county fair. It was morning and Tammy was in the bathroom getting ready for her workday. Kate recalled she would wake up "getting fingered" by Keith, which she explained as Keith's finger penetrating her vagina. According to Kate, "fingering" was "about as far" as Keith would go with the abuse when Tammy was in the home.

{¶ 15} Kate described the Carpenters as strict parents who wanted to run a strict,

"Christian based" household. They required the girls to do chores, wear certain clothing, and prevented their access to social media. Kate described Tammy as the "bad cop parent" and Keith as the parent that would "always bend the rules."

{¶ 16} For example, Keith would let Kate use his phone to go on social media. But, most of the time, this occurred while he was raping her. Kate would use social media as a distraction while the abuse was occurring. She could be talking to her friends and acting like everything was okay. Kate explained, "It was the only way I could deal with it."

{¶ 17} Kate recalled that Tammy left the household for an extended period because she "needed a break." She left Kate and Danielle alone with Keith. During that time, things got "really bad." Kate recalled that Keith would make Danielle and her "do things" to one another, and he would watch, or he would participate. This became a daily routine, instead of one or two days a week.

{¶ 18} Kate did not feel supported enough by Tammy to disclose the abuse. She did not want to tell someone who would just leave her. Kate also relayed that Keith had come home with "gross movies" and Tammy found them and simply took them. Tammy also found a Valentine's Day letter that Keith had given to Kate. Kate did not recall exactly what the letter said, but it was not a "father/daughter Happy Valentine's Day. It was more of a – what should have been a husband/wife sort of situation." Tammy took the letter to her father and stepmother, and they "talked about it." Shortly afterward, Kate and Danielle moved with Tammy, and not Keith, to a different home.

{¶ 19} Kate recalled a memory of this period when they were living separate from Keith. She was still in middle school. Keith and Tammy "came up" with the idea that Keith and Kate should go on a "daddy/daughter date" which was where a dad is meant to show a daughter how a young man is supposed to treat her. Kate recalled that Keith picked her up at Tammy's house with flowers and they went to an escape room and restaurant.

Eventually they went back to Keith's house. He had a black light on and asked her to show him her underwear and told her, "the rest of the night was how a boy is supposed to treat you, but only I can treat you like this."

{¶ 20} Eventually, Keith moved back in with the family. For a brief time, a month or two, Keith did not abuse her. Eventually, however, Keith resumed the abuse. Kate testified that Keith, who was also abusing Danielle, would show both daughters pornography on his work phone. Kate recalled that Keith would watch pornography and touch himself or touch her. Kate recalled this occurring during her middle school years.

{¶ 21} Kate said that Keith would make her and Danielle "do things together." She had observed Keith raping Danielle. There were times where Kate would "start stuff" – that is, intervene in Keith's attempts to molest Danielle by attempting to attract Keith's attention – even though she did not want to.

{¶ 22} In the fall of her first year of high school, in October 2018, Kate recalled that she was in the living room when Keith was raping her orally, while she was on his phone. Something "snapped" in her. She testified that she said, "no, you're not going to touch me anymore, you're not going to touch [Danielle] anymore. And the only thing he has to say to me is, give me my phone back." She refused to give the phone back and so he went over to a closet and pulled out a black box which Kate knew had a gun in it. Keith said, "just know I always loved you" and walked outside. She called Tammy and told her, vaguely, that something happened between her and Keith and that he had gone to kill himself.

{¶ 23} Some family members came over afterwards. Kate told them what happened. Tammy then got Keith a hotel room for that night. Kate said she had no contact with Keith for a year.

{¶ 24} Kate recalled going to talk to someone with a recorder at Cincinnati Children's Hospital. Kate testified that she told that person the truth about everything that had occurred

with Keith. However, nothing happened after she disclosed the abuse.[3] Kate thought she did something wrong and felt hopeless.

{¶ 25} Keith started coming back around the family in 2019, when Kate was a sophomore in high school. Kate recalled that something broke in the house and he came to fix it. They lived on a farm, and he began helping them feed their animals. And then he started staying for dinner, to watch a movie, or to play a game.

{¶ 26} Kate and Keith never talked about what happened. And Tammy had a "rule" that she and Danielle were never supposed to be around Keith alone. But one day, Kate found herself alone with Keith in the barn and he made two crude sexual comments.

{¶ 27} Keith eventually moved back in with the family. Kate admitted that she and Danielle started "acting out" after Keith returned. Her relationship with Tammy became "very bad" because she felt like Tammy was allowing Keith back into their lives. Kate testified that Tammy and Keith began calling her "demon possessed." Twice, they made her go to a conference where she would "pray demons" out of herself.

{¶ 28} Kate admitted that she kicked Tammy and was arrested and went to court. The state played a video that Tammy took of Kate outside the home while Kate was visibly angry about something. Kate curses and appears to attack Tammy. Kate testified that Tammy would record her whenever she was angry and that this would make her angrier.

{¶ 29} Kate recalled one instance where Tammy got mad at her about her not having fed the animals. Kate walked away from the house and eventually walked to the house of her youth pastor, Jeff Wyss, and his wife. Kate told Jeff that she did not feel safe at her home.

{¶ 30} Jeff told her that he had to call her parents. Jeff called them and Tammy and

---

3. As will be discussed later, Danielle was interviewed in 2018 about Kate's allegations and denied that she was being abused. Keith was never charged in 2018.

Keith appeared at Jeff's house. Tammy jumped out of the car and ordered Kate back in the car. Kate refused and said she would not come home unless Keith left. Tammy refused to make Keith leave. Kate said that she felt like Tammy chose Keith over her.

{¶ 31} Kate testified that she told Jeff to "call the cops" and he did so. The police arrived and she spoke with a police officer. The police officer asked her why she did not feel safe. She said that Keith used to rape her and her sister, and he is living there again, and she did not feel safe.

{¶ 32} Eventually, the police spoke with Keith and Tammy. That night, Kate stayed with an aunt. Then she went to stay with other family members. Finally, she went to live with a new foster mother. Since that time, approximately two years before her testimony, she had been living in foster care, separate from Danielle.

{¶ 33} On cross-examination, Kate conceded that while she once cared for Keith, she no longer cared for him. She considered her new foster mother her family. She testified that both Keith and Tammy hurt her. Kate also noted that Keith and Tammy had both relinquished her custody.

**B. Danielle's Testimony**

{¶ 34} Danielle testified that she was born in December 2004. She was 17 years old at the time of trial. She met Keith and Tammy when she was five years old, and they received custody of her in 2010. Keith started "doing stuff" to her that he was not supposed to when she was in the seventh grade, in approximately 2016 or 2017.

{¶ 35} The first thing he did was kissing her in his bedroom. Then he exposed his penis to her while they were in the barn. While she was in the seventh grade, he took her clothes off in the craft room and his penis was touching her private part but there was no penetration. He would tell her "just don't tell nobody."

{¶ 36} In eighth grade, Danielle testified that there were times she and Kate would

get home from school and Keith would be there and would have sex with them. It happened so many times she could not count. Danielle also recalled that Keith would give them vodka and they would have sex.

{¶ 37} Danielle recalled the incident at the county fair where Kate's friend Ella was present. Tammy was not there because Tammy did not like the camper. Keith supplied them with alcohol and then Keith had sex with Danielle. Danielle thought that Kate and Ella had sex. Danielle was 13 years old at the time, between the 7th and 8th grade.

{¶ 38} In March or April 2019, Danielle testified that she went turkey hunting with Keith. During the hunt, and over the course of a week, Keith had vaginal sex with her nine times in a turkey blind. The state introduced a text message that Danielle sent to her best friend, Matthew. In it, she stated that Keith had sex with her once on the prior Saturday, once on Sunday, once on Monday, twice on Wednesday, three times on Thursday, and once the day of the text (Saturday).

{¶ 39} Matthew subsequently relayed Danielle's allegation to his youth pastor, Jeff Wyss, who was also Kate and Danielle's youth pastor. Danielle was "angry" when Matthew told Jeff because she thought that they were all going to "do it" (that is, disclose the abuse) together, and that they would do so a "couple days" later. She said she was barely prepared for the disclosure, and she was scared.

{¶ 40} Danielle recalled that Jeff came over to the house. Jeff asked her about the allegations. She said, "yeah." Jeff then called the police. After the police arrived, she went to Children's Hospital for testing. Three or four days had passed since the last incident of abuse that occurred during turkey hunting and when she went to the hospital for testing.

{¶ 41} Danielle testified regarding her initial failure to disclose Keith's abuse when Kate first alleged abuse. She testified that she did not disclose at that time because she was scared and embarrassed. She regretted not telling but felt like she was protecting

herself from having to do "hard things" like find a new home. At that time, protecting her family and the people that she relied on were the important things in her mind.

### C. Jeff Wyss' Testimony

{¶ 42} Jeff Wyss testified he was a 13-year police detective with the Mason Police Department. He and his wife were also youth pastors at their church.

{¶ 43} Jeff had previously met Keith through their church. Keith had told him that he had "stepped out on his family." Jeff said he "didn't have a good feeling" about this comment from Keith. He tried to keep his contact with Keith to a minimum afterwards.

{¶ 44} Jeff first met Kate and Danielle in August or September of 2019 when they started attending youth group at the church. Tammy made it clear to him that no one other than her was supposed to pick up the girls from youth group.

{¶ 45} On April 28, 2020, two students who were in the youth ministry, including Danielle's friend Matthew, contacted him. The students forwarded text messages that they had received from Danielle. After reviewing those messages, Jeff decided to contact Tammy because he understood that Keith was not residing with her at that time. His wife called Tammy and said, "you need to come over as soon as possible." Tammy arrived and Jeff informed her what he had learned. Tammy's initial reaction was she did not want to believe Danielle, but she did not know how she was going to "handle it" if the allegations were true. Jeff asked Tammy a few more questions. Tammy told him that Kate had made allegations in 2018. Afterwards, Jeff told Tammy that either he would call police, or she could. She asked him to call and so he did.

{¶ 46} Tammy then allowed Jeff to come to her home. Jeff and his wife sat down at the kitchen table with Danielle, Kate, and Tammy. Danielle stated she knew why they were here. Jeff asked her if she understood what rape meant and she said "it's when someone has sex with you and you don't want it to happen." He asked her if that was what occurred

when she was talking about Keith in the text messages. She confirmed it was. At that point, Kate stood up, started screaming, and ran out of the room and Tammy went to console her.

{¶ 47} Months later, in September 2020, Kate appeared at Jeff's house after dark and put her head down and started crying. He realized she had not driven over and must have walked. Jeff estimated it was a 12-to-15-minute car ride from Kate's house and 5 to 7 miles as the crow flies. He told Kate that she could not stay there, and he would need to call her mom. He did so. Within 15 or 20 minutes, Tammy and Keith drove up in the car. Jeff was confused at seeing Keith in the car.

{¶ 48} An argument ensued on his front yard between Kate, Keith, and Tammy. Kate's position was she was not going back home unless Keith left. Jeff then said that if Kate would not go back with her parents, he would have to call the police. Kate told him, "do whatever you have to do." He contacted police and informed them of the situation. A deputy arrived, and he remembered the deputy looking at Keith and saying, "why are you living at the house? You're not supposed to be at the house." Jeff believed that Kate went home with the deputy that night and then he did not see or hear from her again until she was placed with her current foster mother.

### D. Sergeant Morgan Wages' Testimony

{¶ 49} Sergeant Wages testified that in December 2018 he was employed as an investigator with the Clinton County Sheriff's Department. He had investigated the December 2018 allegations made by Kate against Keith. Sergeant Wages testified that that case was closed after they conducted follow-up interviews with Tammy and Danielle. In April 2020, he investigated a new allegation that a rape had occurred at the Carpenters' home. He arrived on scene and, after assessing the situation, had Danielle transported to Cincinnati Children's Hospital for a sexual assault kit. Authorities sent Danielle's sexual

assault kit to BCI for analysis. BCI did not recover any DNA evidence. Sergeant Wages also processed the hunting blind where Danielle alleged the incidents occurred. There was no physical evidence recovered from the blind.

### E. Testimony of Defense Character Witnesses and the State's Rebuttal Witnesses

{¶ 50} After the state rested its case, the parties and court discussed Keith's planned defense. Keith's counsel indicated that he would call three witnesses, each of which would be testifying to Keith's good character. The state objected. After the parties debated the issue, the court determined that it would permit Keith to call his witnesses and elicit the desired testimony. Keith then called each witness. They all testified that Keith had a good reputation in the community and that the sexual assault allegations were inconsistent with his character.

{¶ 51} The state then called three witnesses in rebuttal, consisting of Keith's father-in-law, mother-in-law, and sister-in-law. All three witnesses testified as to their poor opinion of Keith's character. Over Keith's objection, all three witnesses also testified to their awareness of Keith's use of pornography. Additionally, Keith's sister-in-law described an incident that occurred in 1997 where Keith made an inappropriate sexual remark to her.

### F. Verdict and Appeal

{¶ 52} The jury returned guilty verdicts on all 13 counts of the indictment. The court imposed indefinite prison terms totaling 24 years up to 25.5 years with a maximum term of life in prison. Keith appealed, raising six assignments of error.

### II. Law and Analysis

### A. Character Evidence During State's Rebuttal

{¶ 53} Keith's first assignment of error states:

> THE TRIAL COURT ERRED TO THE PREJUDICE OF THE
> DEFENDANT-APPELLANT WHEN IT ALLOWED THE STATE
> TO PRESENT INADMISSIBLE CHARACTER EVIDENCE

DURING THE STATE'S REBUTTAL EVIDENCE.

{¶ 54} Referring to the character testimony offered at trial by his father-in-law, mother-in-law, and sister-in-law in rebuttal to Keith's character witnesses, Keith contends that the trial court erred by permitting the state to introduce evidence of his sexual activity in violation of Ohio's rape-shield statute. He further argues that no statutory exceptions applied that would permit such evidence. Keith also argues that the admission of this evidence violated various evidentiary rules pertaining to the inadmissibility of character or trait evidence, or evidence of other wrongs or acts. Keith contends that the state submitted this evidence for the sole reason of "inflame[ing] the passions of the jury" and for purposes of proving propensity.

### 1. Standard of Review

{¶ 55} The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 30. An appellate court will not reverse the trial court's decision to admit or exclude relevant evidence absent an abuse of discretion. *Id.* An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13.

### 2. Applicable Statutes and Rules

{¶ 56} Keith's arguments in support of his first assignment of error concern several statutes and evidentiary rules.

{¶ 57} R.C. 2907.02(D), Ohio's rape-shield statute, provides that:

> Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or

infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

{¶ 58} Evid.R. 404(B) provides that "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the rule does not preclude evidence of other crimes, wrongs, or acts if admitted for other reasons. Evid.R. 404(B)(2) expressly provides that "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

{¶ 59} R.C. 2945.59, similarly to Evid.R. 404(B), provides that evidence tending to show the commission of another crime is admissible in certain cases where the objected to evidence is "material." The statute provides,

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 60} Finally, we note the general requirement for admissibility in a trial is relevance. Evidence is relevant, and therefore generally admissible under Evid.R. 402, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

### 3. Character Witnesses and Rebuttal

{¶ 61} At the conclusion of the state's case, Keith's defense counsel informed the court that he was planning to call defense witnesses to testify as to their opinion of Keith's good character. The state objected to this anticipated testimony, stating that the prosecution understood that Keith was not going to testify in his own defense, that the state had never raised the issue of Keith's credibility at trial, and that his character was not at issue at the trial.

{¶ 62} In response, Keith argued that his character was at issue because he was "disputing these allegations" and that his witnesses could offer testimony regarding "pertinent character traits." Furthermore, Keith's defense counsel acknowledged that by submitting character evidence into the trial, this "opens the door for the prosecutor to put on rebuttal witnesses if she wants."

{¶ 63} The court overruled the state's objection and permitted Keith to present his witnesses. The court added that the testimony would be "limited to [Keith's] reputation and character."

{¶ 64} Regina Parton testified that she knew Keith from softball games and that her daughter was friends with Kate and had been over to the Carpenters' house. Regina testified that she believed that Keith had a good reputation in the community and that the alleged sex offenses were inconsistent with his character.

{¶ 65} Daniel Quigley testified that he knew Keith in high school and that he had served as a volunteer firefighter with Keith. Daniel had a positive opinion of Keith's character. Daniel opined that the offenses alleged against Keith were inconsistent with the person he knew.

{¶ 66} Roger Houck testified that he had employed Keith since 2013 and that Keith had a good reputation. Roger believed that the sexual offense allegations against Keith

were inconsistent with his good character.

{¶ 67} Prior to the defense resting its case, the parties and court engaged in a conversation concerning the state's intended rebuttal evidence, consisting of three witnesses. Keith objected to their anticipated testimony.

{¶ 68} The state indicated to the court that its three witnesses intended to testify about specific instances of conduct that rebutted Keith's witnesses' testimony that the sexual offense allegations were inconsistent with his good character. The state indicated that the subject matters covered in the rebuttal witnesses' testimony were (1) the witnesses' personal knowledge as to Keith's use of pornography, (2) the alleged inappropriate Valentine's Day card sent by Keith to Kate (one of the witnesses would testify that she had seen it and would testify to its content), and (3) inappropriate letters sent by Keith to Tammy's younger sister.

{¶ 69} The court partially granted and partially overruled Keith's objection. The court found that Keith's use of pornography had been an issue discussed at trial and that the court would allow this testimony. The court further determined that it would not permit the state to ask questions about the alleged Valentine's Day card or inappropriate letters sent by Keith to Tammy's younger sister, because neither the Valentine's Day card nor inappropriate letters were available for admission into evidence.

{¶ 70} The state's rebuttal witnesses then testified. Robert Kirk, Keith's father-in-law, testified that he had known Keith since 1992 or 1993. He viewed Keith as a "very selfish individual." Robert testified that he was "surprised somewhat" by the allegations, but that Keith had confessed to him that he had a problem with pornography. Linda Kirk testified that Keith was her husband's son-in-law. She had known him for six years and was aware of "the pornography part." She viewed Keith as a "bad character."

{¶ 71} Finally, Robin Danku testified that she was Tammy's older sister. Robin

testified that Keith had talked about having a pornography addiction at a family meeting. Robin also testified that she had seen Keith's workshop and that it was "plastered" with graphic sexual images from Penthouse magazine. Robin also recalled an incident in 1997 where Keith had made a "very inappropriate comment" to her. Keith had told her that he had a fantasy that she would touch herself sexually while he watched. She was shocked and disgusted.

### 4. Analysis

{¶ 72} Under the circumstances presented here, we find no error. As candidly acknowledged by Keith's counsel at trial, once Keith decided to present evidence that his good character was inconsistent with the sexual assault crimes for which he was charged, he opened the door to rebuttal evidence on pertinent character traits on the same subject. "Under Evid.R. 405(A), 'inquiry is allowable into relevant specific instances of conduct,' on cross-examination, to challenge the opinion of a character witness." *State v. Jackson*, 57 Ohio St.3d 29, 39 (1991) (holding that because the defendant's girlfriend testified about defendant's character, the prosecutor could cross-examine her about specific instances of conduct). *Accord State v. Clinger*, 12th Dist. Preble No. CA2021-11-014, 2022-Ohio-3691, ¶ 19; *State v. Bozeman*, 12th Dist. Butler No. CA2008-10-248, 2009-Ohio-3677, ¶ 49, 50 (noting that the protections afforded to an accused by the rape-shield statute may be waived when the accused opens the door by interjecting the issue of his character). *See State v. Estep*, 12th Dist. Clinton No. 490, 1984 WL 4348, *3 (Mar. 5, 1984) ("The state may * * * introduce evidence of a defendant's previous convictions where the defendant first places his character at issue").

{¶ 73} Keith's character witnesses each opined that his character was inconsistent with the sexual offense allegations. Keith therefore opened the door for the state to present rebuttal evidence on the same subject. As such, Keith cannot now claim that it was error

to allow rebuttal evidence discussing his character or reputation regarding sexual activity. *Jackson* at 39.

**{¶ 74}** However, even if we determined that error occurred here, we would deem any error harmless. "'Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction.'" *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, at ¶ 177, quoting *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus, *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135 (1978). "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 32.

**{¶ 75}** As discussed, the testimony offered by all six character witnesses in this case was not relevant or helpful in deciding any of the contested factual issues. On the other hand, Kate and Danielle both testified at length and in detail as to the abuse their father perpetrated on them over the course of many years. The jury accepted Kate's and Danielle's testimony and we find no reasonable probability that the irrelevant character evidence played a part in the outcome of the proceedings.

**{¶ 76}** For the foregoing reasons, we overrule Keith's first assignment of error. We will address the remaining assignments of error out of the order presented in Keith's appellate brief.

### B. Crim.R. 29 and Sufficiency of the Evidence

**{¶ 77}** Keith's third assignment of error states:

> THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S CRIMINAL RULE 29 MOTION.

**{¶ 78}** Keith contends that the trial court erred in overruling his Crim.R. 29 motion for

acquittal, which he asserted upon the close of the state's evidence.

## 1. Standard of Review

{¶ 79} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the-evidence claim. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

{¶ 80} When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

## 2. Analysis

{¶ 81} Keith argues that the state failed to present "digital, photographic, or forensic evidence" that would corroborate Kate's and Danielle's allegations. Keith also argues that there was a "dearth of evidence in this case" and that even when viewed in a light most favorable to the prosecution, rational triers of fact could not have found the essential elements of the offense proven beyond a reasonable doubt.

{¶ 82} In his appellate brief, Keith fails to pinpoint any specific element of any of the 13-count indictment with respect to which he claims the state failed to present sufficient

evidence. This court may disregard an assignment of error if a party fails to identify in the record the error on which the assignment of error is based as required by App.R. 16(A)(7) and App.R. 12(A)(2). "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error." *State v. Watson*, 126 Ohio App.3d 316, 321 (12th Dist.1998).

{¶ 83} Based upon our review of the record, Keith's argument that the state submitted insufficient evidence is meritless. As described above, Kate and Danielle provided testimony regarding each sexual offense charged by the state in the indictments. If the jury believed Kate's and Danielle's testimony, then the jury could have found Keith guilty of all the charged offenses beyond a reasonable doubt. *Paul*, 2012-Ohio-3205 at ¶ 9 (in a sufficiency analysis, the appellate court examines the evidence admitted at trial under the assumption that the jury "believed" the evidence). *Accord State v. Keith*, 12th Dist. Butler No. 2007-07-161, 2008-Ohio-348, ¶ 24. As such, the evidence submitted by the state was sufficient for purposes of the standard of review set forth under Crim.R. 29 and the trial court did not err in denying Keith's motion. *Paul* at *id.* We overrule Keith's third assignment of error.

### C. Manifest Weight of the Evidence

{¶ 84} Keith's fourth assignment of error states:

APPELLANT'S CONVICTION WAS ENTERED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 85} Keith contends that the jury clearly lost its way in convicting him of the 13 counts with which he was charged. He argues that Kate and Danielle were not credible witnesses and there was no other evidence submitted to corroborate their claims.

### 1. Standard of Review

{¶ 86} A manifest weight of the evidence challenge requires this court to examine

the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue over the other. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581, ¶ 46. In analyzing a challenge to the manifest weight of the evidence, this court must review the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 25.

**{¶ 87}** Although a manifest weight challenge requires this court to consider witness credibility, we must be mindful that the determination of witness credibility is primarily for the trier of fact to decide. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. To that end, an appellate court will overturn a conviction due to the manifest weight of the evidence only in the extraordinary circumstance where the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thomin*, 12th Dist. Butler Nos. CA2019-11-188 and CA2019-12-199, 2020-Ohio-4625, ¶ 18.

### 2. Analysis

**{¶ 88}** Keith challenges Kate's and Danielle's credibility, claiming that they provided inconsistent testimonies concerning "what happened, when it happened, and * * * who was present when the alleged sexual acts occurred." However, he fails to point to any specific count of the 13-count indictment for which he claims the jury lost its way. We reiterate, "[i]t is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error." *Watson*, 126 Ohio App.3d at 321.

**{¶ 89}** We have reviewed the record in this case, and we do not find that the jury lost its way in convicting Keith of the offenses charged in the indictment. Potential issues with

Kate's and Danielle's credibility are matters for the factfinder and we generally defer to the factfinder on all matters of witness credibility. *State v. Spradlin*, 12th Dist. Clermont No. CA2016-05-026, 2017-Ohio-630, ¶ 68.

**{¶ 90}** That being the case, the parties on both sides brought out issues with Kate's and Danielle's credibility during the trial. Those potential issues with their credibility were in fact a central theme of Keith's defense. For instance, Keith's counsel highlighted the fact that the Carpenters were strict parents and that neither Kate nor Danielle enjoyed doing the many farm chores that the Carpenters tasked them with daily. Keith's counsel repeatedly sought to elicit testimony that the children wanted to be "free" of their adoptive parents' controls, suggesting that they would fabricate allegations against Keith to accomplish this goal. Defense counsel also sought to highlight that both girls had engaged in "acting out" and criminal behavior. Counsel thoroughly explored these issues and others at trial through lengthy examination, cross-examination, and re-direct.

**{¶ 91}** On the other hand, Kate and Danielle testified in detail concerning the abuse they suffered between the ages of 10 and 14 and 11 and 15, respectively. Neither Kate nor Danielle wavered as to their claims, contradicted themselves on cross-examination, or gave any other reason to doubt their veracity.[4]

**{¶ 92}** Simply put, a conviction is not against the manifest weight of the evidence because the jury found the evidence presented by the state convincing. *Erickson*, 2015-Ohio-2086 at ¶ 42. The jury was free to believe or disbelieve all, or part of, the evidence presented at trial. *Thomin*, 2020-Ohio-4625 at ¶ 19. This is a case where the jury believed the victims and this is not one of the "extraordinary" cases where the evidence weighed

---

4. Notably, the trial judge commented in the sentencing entry that "[t]hese jury verdicts are the result of [a police investigation] and the courageous testimony of the children." If Kate's and Danielle's testimony compelled the trial court to include this detail in the sentencing entry, we have little doubt that the testimony compelled the jury as well.

heavily in favor of acquittal. *Id.* at ¶ 18. As such, we overrule Keith's fourth assignment of error.

### D. Prosecutorial Misconduct

{¶ 93} Keith's fifth assignment of error states:

THE PROSECUTOR'S MISCONDUCT DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

{¶ 94} Keith alleges three separate instances of prosecutorial misconduct occurred at trial. We review each allegation in turn.

### 1. Standard of Review

{¶ 95} A court will find prosecutorial misconduct only when the conduct complained of was improper and prejudicially affected substantial rights of the defendant. *State v. Sanchez-Garza*, 12th Dist. Butler No. CA2016-02-036, 2017-Ohio-1234, ¶ 43, citing *State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 58. The focus of an inquiry into allegations of prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Id.*, citing *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. Therefore, a finding of prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial because of the prosecutor's prejudicial conduct. *Id.* citing *Layne* at ¶ 60. "The Constitution does not guarantee an 'error free, perfect trial * * *.'" *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990), quoting *United States v. Hastings*, 461 U.S. 499, 508, 103 S.Ct. 1974 (1983).

### 2. Emotional Appeals

{¶ 96} Keith alleges that the prosecutor improperly attempted to appeal to the jurors' sympathy by eliciting testimony and presenting opening statements and closing arguments that would evoke an emotional response. Keith points to testimony regarding Kate's love for her adoptive parents, that she was a foster child, that the Carpenters relinquished her

custody prior to trial, and how it made Danielle feel when Tammy called her derogatory names.

**{¶ 97}** We have reviewed each instance cited by Keith of the state allegedly eliciting improper "emotional" evidence. Keith's counsel did not object at trial to any of the challenged statements, testimony, or argument on the basis that it improperly appealed to jurors' emotions. Accordingly, any alleged error here is subject to a review for plain error.

**{¶ 98}** To constitute plain error there must be a deviation from a legal rule. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Second, the error must be fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection. *State v. Barnette*, 12th Dist Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 30. Third, the error must have affected Keith's substantial rights, that is, the error must have affected the outcome of the trial. *Barnes* at 27. An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

**{¶ 99}** Keith's argument contesting the admission of "emotional" evidence is an evidentiary claim, which we first review for relevancy. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 112-114. Evidence is relevant, and therefore generally admissible under Evid.R. 402, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. A trial court may exclude relevant evidence if "its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B). Further, a court must exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice * * *." Evid.R. 403(A).

{¶ 100} Reviewing for plain error, we note that through the course of Kate's and Danielle's testimony, the state introduced evidence about Kate and Danielle's status as foster children, their placement with the Carpenters at an early age, the importance of their placement with two parents, their love for both of their adoptive parents, and the importance of stability in the family unit. The state also commented on these matters in opening statement and closing argument.

{¶ 101} We find that this evidence and argument was relevant to issues raised in the case and specifically was relevant to Kate's and Danielle's credibility. Kate and Danielle testified to the importance of having a loving, stable family, and how this was even greater for them because of their past experience as foster children. Their testimony helped explain that maintaining the façade of a loving family was, for many years, more important to them than confronting or disclosing the abuse they were suffering.

{¶ 102} Kate and Danielle further shared their concerns and fears that disclosure would result in their having to return to the foster system. Danielle testified that she initially did not disclose Keith's abuse because she did not want to have to find a new home. In addition, both testified that when Keith was not abusing them, he treated them well and was a good father.

{¶ 103} The evidence Keith challenges was also relevant in that it served to counter the defense's suggestion that Kate and Danielle were fabricating the allegations because the Carpenters were strict parents, because the girls did not want to do chores, and because the girls wanted to be free of their adoption by the Carpenters.

{¶ 104} In sum, the challenged testimony and argument, which Keith generalizes as "emotional," provided context and helped jurors understand why these were particularly vulnerable victims and how Keith was able to continue perpetrating his abuse for so long. The challenged testimony was admissible because it was relevant and because its

probative value was not outweighed by concerns over unfair prejudice to Keith. The trial court did not plainly err by failing to sua sponte refuse to admit the evidence or censor the state's opening statement and closing argument. Therefore, Keith has failed to establish plain error.

### 3. "Guilt by Association"

{¶ 105} Keith next argues that the state committed misconduct by relying on "guilt by association" evidence. Specifically, Keith challenges evidence introduced in the case concerning the physical, mental, and emotional abuse inflicted on the children by Tammy. Specifically, Keith points to Kate's testimony that Tammy chose Keith over her when Kate disclosed Keith's sexual abuse and that Tammy had emptied Kate's bank account of approximately $12,000 that Kate had earned through a job at Wendy's and through her activities with 4H. Keith also refers to Danielle's testimony about how she felt when Tammy would call her names. This included testimony that Tammy would call Kate and Danielle "demon possessed." In addition, Danielle described physical confrontations she had with Tammy. Keith argues that this evidence was "irrelevant" and was "only being used to get the jury to hate [Tammy] and then convict [Keith] through guilt by association."

{¶ 106} We find that evidence concerning Tammy's toxic relationship with the children was relevant to providing context to the household situation and how that relationship, or lack thereof, may have extended the abuse. That is, it was helpful to explain why the children did not turn to or did not feel that they could turn to Tammy for assistance. The evidence was also relevant to counter Keith's attempts to discredit the children by introducing video taken by Tammy of the conflicts between herself and the children. In sum, we find nothing in the record that would demonstrate an abuse of discretion, much less, plain error in the admission of evidence related to Tammy's relationship with the children.

#### 4. Personal Opinions and Improper Vouching

{¶ 107} Keith argues that the prosecutor improperly introduced her own private opinions as part of her closing argument. Keith argues that the prosecutor called Keith a "coward." Keith challenges the following comment by the prosecutor:

> These crimes are perpetrated by cowards who prey on vulnerable individuals such as [Kate] and [Danielle] who were in foster care first, and then he picked them out of foster care, adopted them, and then what did he start to do? He started grooming them.

{¶ 108} We first note that the prosecutor did not directly call Keith a "coward," but indicated that *perpetrators* who abuse children are cowards. Nonetheless, we find that this is a fair comment, whether the comment is considered generally or specific to Keith's actions. The evidence, if believed, would establish that Keith chose to perpetrate his sex crimes against adopted daughters, who were young and defenseless at the time he began grooming them. Keith's actions, if proven, were in fact cowardly, and the prosecutor's comment was fair.

{¶ 109} Keith cites *State v. Keenan*, 66 Ohio St.3d 402 (1993), as an allegedly similar case where the prosecutor "crossed the line" by engaging in repeated attacks on the defendant and on the defendant's counsel. In that case, the Ohio Supreme Court found that a prosecutor's "pattern of misconduct throughout much of the trial and during closing argument" deprived the defendant of a fair trial. *Id.* at 405. This "pattern" included the prosecutor commenting on defense counsel as being insincere in their defense, criticizing defense counsel for objecting during trial, encouraging jurors to react emotionally to gruesome photographs of a corpse, calling the defendant an "animal," expressing a personal opinion about the strength of the state's case, and using the bad character of the defendant's friend to attack the defendant's character. *Id.* at 406-410.

{¶ 110} *Keenan* is an extreme example of repeated instances of misconduct and

appealing to jurors' emotions rather than the evidence introduced at trial. Nothing that occurred in Keith's trial is remotely similar to the prosecutorial misconduct that occurred in *Keenan*. The state did not denigrate or criticize defense counsel and did not encourage jurors to improperly focus on gruesome evidence rather than evidence of guilt. To the extent that the prosecutor referred to Keith as a "coward," such an invective was not *per se* unfair. *See Keenan* at 408, citing *Darden v. Wainwright*, 477 U.S. 168, 180-183, 106 S.Ct. 2464 (1986) (Holding that offensive, even "universally condemned" comments did not result in a denial of due process); *State v. Wiles*, 59 Ohio St.3d 71, 87 (1991) (Holding that "highly unprofessional" invectives did not deprive a defendant of a fair trial). And we have already discussed the reasons we believe the comment was fair. Finally, the state in this case did not focus on Tammy's bad character to attack Keith's character but rather to provide context to the offenses and to bolster Kate's and Danielle's testimony.

{¶ 111} Next, Keith argues that the prosecutor impermissibly vouched for the state's evidence by arguing against the attempts by the defense to discredit Kate's and Danielle's credibility. Improper vouching occurs when a prosecutor implies knowledge of facts outside the record or places her or his personal credibility in issue. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 145. A prosecutor may not express a personal belief or opinion as to a witness's credibility. *Id.* However, a prosecutor may comment on "considerations that the jury could properly consider in evaluating [a witness'] credibility: his demeanor, consistency, and opportunity to observe, as well as the extent to which other evidence corroborated his testimony." *Id.* at ¶ 147. Keith points to the following commentary by the prosecutor:

> Was it the parents who on the second that the first disclosure happens, they start telling everybody who will listen that the girls were demon possessed, taking them to conferences to bind the demons?

And you don't have to take my word for it. Please look at Defense Exhibits M and M-A, that Defense counsel, again, only played you the certain portion of. I'm asking to look deeper. Look at the whole thing.

What does mom state in that when she was supposedly overwhelmed? Get behind me Satan, looking at [Danielle]. This is evidence against you.

They knew this was coming. They knew that at some point, showing those girls as being these defiant girls on the surface might confuse you.

I know better. I know it won't. I know that you'll look deeper than that. I know that through your life experiences, you know that these things don't just happen because someone didn't get a cell phone or didn't get social media or I don't get to wear the clothes that I want to wear.

**{¶ 112}** Upon review, we do not find that the prosecutor improperly vouched for the credibility of the state's witnesses or expressed an opinion as to the victims' credibility. In context, the statement "I know better" was not the prosecutor stating that she personally knew that the victims' testimony was credible, but rather, that the prosecutor knew that the jury would not be swayed by the suggestion that the children made up these allegations to be defiant or because they were "demon possessed." We find that the comment was a fair remark and a fair argument counter to the defense strategy, not prosecutorial misconduct. For the foregoing reasons, we overrule Keith's fifth assignment of error.

### E. Cumulative Error

**{¶ 113}** Keith's sixth assignment of error states:

THE APPELLANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL THROUGH CUMULATIVE ERROR.

**{¶ 114}** Keith argues that even if a single error was insufficient to demonstrate grounds for relief, the cumulative effect of all errors that occurred in his trial deprived him of his constitutional right to due process of law and a fair trial under the United States and Ohio constitutions. But for the reasons described above, Keith has demonstrated no errors

that occurred at his trial, including no violations of his constitutional rights. The cumulative error doctrine is inapplicable when there are not multiple instances presented of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). We overrule Keith's sixth assignment of error.

### F. Constitutionality of Reagan Tokes Act Sentence

{¶ 115} Keith's second assignment of error states:

THE TRIAL COURT'S SENTENCE UNDER R.C. 2967.271 VIOLATES THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶ 116} Keith argues that the trial court's imposition of an indefinite prison term pursuant to the Reagan Tokes Law, Ohio's indefinite sentencing structure set forth in R.C. 2967.271, was unconstitutional. This is because, according to Keith, the Reagan Tokes Law violates the separation-of-powers doctrine and his due process rights.

{¶ 117} Keith, however, did not raise this issue with the trial court. As this court has repeatedly held, "arguments challenging the constitutionality of the Reagan Tokes Law are forfeited and will not be heard for the first time on appeal in cases where the appellant did not first raise the issue with the trial court." *State v. Blaylock*, 12th Dist. Butler No. CA2020-11-113, 2021-Ohio-2631, ¶ 7. *Accord State v. Lee*, 12th Dist. Warren No. CA2021-05-047, 2022-Ohio-248, ¶ 34-35; *State v. Bond*, 12th Dist. Butler No. CA2021-08-103, 2022-Ohio-1628, ¶ 28-29; and *State v. Rojas*, 12th Dist. Preble No. CA2021-11-013, 2022-Ohio-2333, ¶ 16.

{¶ 118} Therefore, given this court's consistent precedent declining to hear arguments challenging the constitutionality of the Reagan Tokes Law in cases where the issue was not

first raised with the trial court, we overrule Keith's second assignment of error.[5]

### III. Conclusion

**{¶ 119}**  We overrule all of Keith's assignments of error for the reasons stated above.

**{¶ 120}**  Judgment affirmed.

PIPER, P.J, and S. POWELL, J., concur.

---

5. We note that, even if Keith had not waived this issue by raising a constitutional challenge to the Reagan Tokes Law below, we find the underlying premise behind each of Keith's arguments has already been considered and rejected by this court. *State v. Bloodworth*, 12th Dist. Warren No. CA2021-08-073, 2022-Ohio-1899, ¶ 50, citing *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 7-17 (the Reagan Tokes Law does not run afoul of an offender's due process rights); *State v. Suder*, 12th Dist. Clermont Nos. CA2020-06-034 and CA2020-06-035, 2021-Ohio-465, ¶ 25 (the Reagan Tokes Law does not violate the separation-of-powers doctrine).