[Cite as *State v. Gonzalez*, 2025-Ohio-1314.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

SERGIO FRANCISCO GONZALEZ,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0076**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CR 00185

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor*, Atty. Ralph M. Rivera* and *Atty. Kristie M. Weibling*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee and

*Atty. Mark J. Lavelle*, for Defendant-Appellant.

Dated: April 11, 2025

**DICKEY, J.**

{¶1} Appellant, Sergio Francisco Gonzalez (d.o.b. 8/15/00), appeals his convictions for two counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, following a jury trial in the Mahoning County Court of Common Pleas. R.C. 2907.02(A)(1)(b) reads, in pertinent part, "[n]o person shall engage in sexual conduct with another when any of the following applies: . . . (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  "Sexual conduct" includes fellatio, which is not statutorily defined, but the jury instructions in this case defined as "a sexual act committed with the penis and the mouth."  The victim, A.C. (d.o.b. 4/8/06), is Appellant's first cousin and was eleven years of age on both occasions that Appellant caused her to perform fellatio on him. Appellant was seventeen years of age at the time.

{¶2} This matter is before us for the second time.  In *Matter of S.G.*, 2022-Ohio-897 (7th Dist.), we reversed the judgment entry of the juvenile court finding Appellant was amenable to rehabilitation in the juvenile court system. We predicated our decision on the factors in R.C. 2152.12(D) and (E), which favored transfer, and the fact that Appellant was two months shy of his twenty-first birthday when the juvenile court's judgment entry was issued.  Moreover, the juvenile court's decision to retain jurisdiction was based upon the delay of the charges, which resulted from A.C.'s failure to disclose the crimes for roughly two years and the police investigation that followed.  Accordingly, we remanded the matter to the juvenile court with instructions to transfer the case to the general division of the common pleas court.

{¶3} In this appeal, Appellant advances two assignments of error.  First, Appellant argues the trial court abused its discretion in permitting the state to elicit testimony from Appellant's grandmother, K.G. ("Grandmother"), regarding sexual relationships involving Appellant and two foster girls, which occurred while Appellant and each girl were cohabitating in Grandmother's home, and his pending misdemeanor charge for marijuana possession. Second, Appellant argues his trial counsel was ineffective for "opening the door" to the foregoing testimony during Grandmother's direct testimony, failing to object to the introduction of Appellant's pending drug charge, and failing to secure an expert on the subject of delayed disclosure.

Case No. 24 MA 0076

{¶4} For the following reasons, we find the trial court abused its discretion in admitting Grandmother's testimony on cross-examination regarding Appellant's sexual relationships with the foster girls cohabitating with Appellant in Grandmother's residence, as the testimony was prejudicial and violated Ohio rape shield law. Because the remainder of the record contains overwhelming evidence of Appellant's guilt, we find Appellant suffered no prejudice as a result of the wrongly-admitted evidence. We find no abuse of discretion with respect to the trial court's admission of Grandmother's testimony regarding Appellant's misdemeanor drug charge, as it was offered to contradict her direct testimony that Appellant had never been in any trouble prior to the rape charges. We further find Appellant's second assignment of error has no merit, as defense counsel was able to cross-examine the state's witnesses on delayed disclosure, and defense counsel's allegedly deficient performance did not result in outcome-determinative prejudice.

## FACTS AND PROCEDURAL HISTORY

{¶5} A.C., her mother, C.G. ("Mother"), two law enforcement officers who investigated A.C.'s allegations, a certified nurse practitioner, and several mental health counselors who examined or treated A.C. testified on behalf of the state. Appellant, Grandmother, and Mother's first cousin, J.C., testified on behalf of the defense.

{¶6} Grandmother raised Appellant in her home from approximately his first birthday. Appellant considers her to be his mother. In addition, Appellant's brother, Messiah, Appellant's sister, Malinna, and a fourth grandchild and their cousin, Delilah, were also raised by Grandmother in her home.

{¶7} In addition to raising four of her grandchildren, Grandmother was a foster parent. Many foster children rotated in and out of Grandmother's residence during the roughly eighteen years that Appellant resided with her. A.C. testified Grandmother often fostered siblings. Grandmother maintained separate bedrooms for girls and boys.

{¶8} A.C. visited Grandmother's residence several times a week and frequently participated in "sleep overs" with Malinna and the various foster girls. A.C. testified it was common for her cousins to congregate at Grandmother's house because "that's where [they] had the pool, the trampoline, the playground. It's where [they] all went to play." (7/8/2024 Trial Tr., p. 334.)

{¶9} On December 31, 2017, A.C. was an overnight guest at Grandmother's house following the family's New Year's Eve party. According to A.C., Grandmother was fostering X.B., Z.B., E.B., and X.W. in addition to housing Appellant, Malinna, Delilah, and Appellant's girlfriend, Davionna.

{¶10} When Grandmother was asked who was residing in the house at the time, she responded, "I had like five foster kids and [Appellant's] girlfriend." Grandmother identified the residents in her home as "[Appellant], Malinna, Delilah, [Z.B.], [X.W.], and X – X – and [E.B.]" (*Id.* at p. 478.) Grandmother testified that Appellant and Davionna had their own room, which she identified as the "pink room."

{¶11} According to A.C.'s testimony, she was asleep in the girls' bedroom after celebrating the new year at midnight, when she was awakened by a beam of light from the hallway. Appellant stood in the doorway and asked A.C. to come into the boys' bedroom because Appellant had something to show her.

{¶12} With the male foster children asleep in the boys' bedroom, Appellant offered marijuana to A.C. She testified she had heard of marijuana but was unaware of its effects. A.C. conceded that she said, "[y]eah," so Appellant blew his smoke in her face. When Appellant finished the marijuana cigarette, he and A.C. sat in front of the television in the boys' bedroom. A.C. was on the floor and Appellant was in a chair. A.C. testified her body felt heavy and it was difficult to "sit up straight." (*Id.* at p. 315.)

{¶13} Appellant suggested they play "Truth or Dare." A.C. testified the game "started out normal," then Appellant dared A.C. to sit on his lap. A.C. refused. (*Id.* at p. 308.)

{¶14} Appellant persisted in his effort to get A.C. to move closer to him, then he asked her to perform oral sex. When A.C. declined, Appellant removed his penis from his basketball shorts with one hand, and forced A.C.'s head into his lap with his other hand until her mouth was on his penis. A.C. testified Appellant "finished into a towel." (*Id.*)

{¶15} Appellant instructed A.C. to brush her teeth and go back to sleep in the girls' bedroom. On cross-examination, A.C. added Appellant cautioned her not to tell anyone. (*Id.* at p. 332.)

**{¶16}** "[A]t least a couple of weeks" later, the family congregated in Grandmother's yard. (*Id.* at p. 310.) A.C. entered the house to use the bathroom. Appellant called A.C. into his room to watch him play videogames. Appellant closed the door behind A.C. and asked her to perform oral sex. When A.C. refused, Appellant threatened to tell Mother that A.C. had smoked marijuana. Further, Appellant promised if A.C. obliged his request he would never ask again.

**{¶17}** A.C. resisted and asked Appellant why he wanted her to do it when he had a girlfriend. Appellant explained that "it [felt] better when [A.C. does] it or [he] like[s] when [A.C. does] it more." A.C. told Appellant it was the last time, then she put her mouth on his penis until he ejaculated on a towel. (*Id.* at p. 310.)

**{¶18}** A.C. alleged three additional instances of similar but uncharged conduct over the course of the next two years, for a total of five sexual assaults. (*Id.* at p. 313.) She described one occasion in particular detail, which occurred when Appellant was sleeping at Mother's house. Appellant entered A.C.'s room in the middle of the night and offered her a "dab pen" (a pen that heats and vaporizes cannabis concentrates). A.C. smoked the dab pen then performed oral sex on Appellant. Appellant then attempted to vaginally rape A.C., but "at the last second before he did it, he just stopped and walked out of the room." (*Id.* at p. 312.)

**{¶19}** Mother testified A.C. had become withdrawn and depressed, and was engaging in self-harm and "a lot of behaviors" shortly before her eleventh birthday. Mother attributed A.C.'s behavior to the absence of her father and Mother's recent disability diagnosis. (*Id.* at p. 384.)

**{¶20}** At the time, A.C. attended Rayen Early College, a middle school for gifted children in the city. Mother requested counseling at the middle school through the Red Zone program for A.C. According to A.C., Mother and A.C. were going through a "rough patch," and they were "always at odds with each other." (*Id.* at p. 340.)

**{¶21}** Tamara LeFlore, a qualified mental health specialist with the Red Zone, testified A.C. was originally diagnosed with adjustment disorder due to her absent father. However, the prescribed therapy had failed to help A.C., who remained quiet and withdrawn.

**{¶22}** According to LeFlore, counselors frequently invited students to eat lunch in the counseling room when it was likely a student would be unable to eat in the cafeteria due to their scheduled appointment. On September 16, 2019, at A.C.'s sixth appointment with LeFlore (they met twice a week), LeFlore and A.C. ate lunch together in the counseling room.

**{¶23}** A.C. testified she and LeFlore "open[ed] up to each other more than [they] did before" over lunch and A.C. felt comfortable divulging the events of New Year's Eve 2017. (*Id.* at p. 314.) LeFlore testified A.C. asked if she could "talk about something. . . and she just poured out." (*Id.* at p. 251.)

**{¶24}** According to LeFlore, A.C. told LeFlore that a male cousin made her smoke marijuana then perform oral sex on him at Grandmother's house. A.C. tearfully explained she had been "holding it in," but did not know "how to deal with it anymore." A.C. was worried about "tearing apart the family," and had prioritized "everybody else's feelings" above her own. (*Id.* at p. 252.) A.C. told LeFlore that A.C. did not have the courage to tell Mother because A.C. was embarrassed.

**{¶25}** LeFlore contacted Mother and reported A.C.'s disclosure to the Mahoning County Children Services Board ("CSB"). A.C. disclosed the rape to Mother in the presence of both school principals, the school social worker, Tracy Blakeley-Clutter, the school psychologist, and representatives from the Red Zone.

**{¶26}** Blakeley-Clutter characterized A.C.'s disclosure as an "aha!" moment, which explained A.C.'s lack of progress in treatment for attachment disorder. As a consequence of A.C.'s disclosure, her diagnosis was changed to post-traumatic stress disorder ("PTSD"). Blakeley-Clutter explained that PTSD is a continuing state with triggers, which requires a different therapy plan.

**{¶27}** Monique Malmer, a certified nurse practitioner at the Child Advocacy Center/Akron's Children's Hospital ("CAC") participated in a 90-minute mental and physical examination of A.C. Malmer testified 70% of all sexual abuse cases involve delayed disclosure, and the length of the delayed disclosure in cases involving children has a mean of three years. According to Malmer, sexual abuse by a family member is particularly disconcerting for the victim, as the victim fears disclosure will disrupt the family unit.

Case No. 24 MA 0076

{¶28} Testing did not reveal the presence of any sexually transmitted disease. Despite a lack of physical findings, Malmer's diagnosis was "highly concerning for child sexual abuse." (*Id.* at p. 435.)

{¶29} Courtney Wilson, a medical social worker at CAC, conducted the diagnostic interview. A.C. reported Appellant "provided her with marijuana and had her smoke it, and told her that if she did not comply with the oral sex, he was going to tell her mother about the marijuana." (*Id.* at p. 364.) Wilson further testified A.C. reported Appellant would rub his penis in front of her and displayed pornographic images on his X-box.

{¶30} According to Wilson's testimony, A.C. exhibited no signs of coaching as she provided experiential details, which Wilson defined as "how something felt or tasted." Wilson testified that experiential details are typically absent when an alleged victim is coached. According to Wilson, A.C. described "putting [Appellant's] penis inside of her mouth and sperm coming out and going onto a towel and it feeling wet." (*Id.* at p. 368.)

{¶31} A.C. recounted Appellant's alleged conduct to several different counselors and medical providers and her accusations were not entirely consistent. For instance, during her CAC examination, A.C. stated Appellant did not ejaculate on the first occasion that he raped her. Further, the number of incidents of sexual assault changed over time.

{¶32} Mother testified she and Grandmother confronted Appellant immediately following A.C.'s disclosure at school. Appellant responded, "[A.C.] wanted a cell phone from me, and that's why she did those things." (*Id.* at p. 381.)

{¶33} When Mother replied A.C. always had a mobile telephone to maintain contact with her father, Appellant "changed it and he said, oh she wanted to use a marijuana pen, vapey thing." (*Id.*) Mother responded A.C. did not "hav[e] a problem with using marijuana or anything like that," and Appellant "just kind of laughed." (*Id.*)

{¶34} Mother testified she was "already in shock" because of the disclosure, so she "kind of just shut up and walked out and left." (*Id.* at p. 382.) Grandmother testified Appellant denied the accusations, stating "[t]hat's a lie because I have Davionna, why would I do that?" (*Id.* at p. 484.)

{¶35} On cross-examination, Mother conceded there was an occasion, "sometime way before [A.C.'s disclosure]," when Mother discovered A.C. was messaging one of the foster boys living with Grandmother. As a punishment, Mother confiscated A.C.'s mobile

telephone. Grandmother testified Mother took A.C.'s mobile telephone away "a couple of times" because of "[t]hings [A.C.] was doing that she was not supposed to be doing." (*Id.* at p. 481.)

**{¶36}** Officer Melissa Perez of the Youngstown Police Department ("YPD") took the initial report in the criminal investigation on September 18, 2019, two days after A.C.s disclosure. (*Id.* at p. 292.) On cross-examination, Officer Perez testified A.C. reported Appellant threatened her numerous times while she was at Grandmother's house following the initial sexual assault, (*Id.* at p. 299), a fact that A.C. did not provide during her testimony.

**{¶37}** YPD Officer Kelly Jankowski interviewed Appellant as a part of the police investigation of A.C.'s allegations. During the November 18, 2019 interview, Officer Jankowski asked Appellant if he had engaged in any sexual conduct with A.C. He responded, "no," then added, "she asked me if she could suck my dick and I told her no." (*Id.* at p. 405.) Officer Jankowski asked Appellant if there was any reason for A.C. to fabricate her accusations, but Appellant provided no explanation.

**{¶38}** According to Officer Jankowski, it is commonplace for child molesters to ply their victims with alcohol and/or drugs in order to reduce the child's inhibitions and weaken his or her resolve. The child's use of an illegal substance serves a dual purpose, as it also provides a source for blackmail to hold over the child to coerce future illegal sexual conduct.

**{¶39}** Appellant testified he did not engage in sexual conduct with A.C. He further testified he recalled a day roughly a year before A.C.'s disclosure when A.C. was at Grandmother's house and she asked Appellant for "weed and a cell phone." (*Id.* at p. 532.) Appellant informed A.C. that he did not have marijuana or a mobile telephone, then A.C. said that she would "do anything for the phone and the weed." (*Id.*) Appellant looked for a spare mobile telephone in order to placate A.C., but could not find one. He explained A.C.'s mobile telephone had been taken away.

**{¶40}** Appellant also testified about the day he was confronted with A.C.'s rape allegations. He was surprised and embarrassed, and he and Davionna moved their belongings to her mother's house that same day. Appellant testified they never returned to Grandmother's house, even for holidays. (*Id.* at p. 537.)

**{¶41}** However, Grandmother testified one week passed between the confrontation and Appellant's permanent departure. (*Id.* at p. 510.) According to Grandmother's testimony, she told Appellant that he must leave her home "so [they] can settle everything and talk and just find out everything that happened." (*Id.*) Appellant wept and could not understand why he was being asked to leave his home. (*Id.* at p. 519.)

**{¶42}** On cross-examination, Appellant conceded he told Officer Jankowski that A.C. offered to "suck [him] up." (*Id.* at p. 539.) The state asked Appellant if he told Grandmother or Mother that his eleven-year-old cousin had offered to perform oral sex in exchange for marijuana and a mobile telephone. Appellant responded "[i]t was just weird, so I never told nobody." (*Id.* at p. 540.)

**{¶43}** J.C., Mother's first cousin, testified that she lived with Mother in 2021. J.C. recalled A.C. receiving notice of a court date and asking Mother for "paperwork." J.C. testified, "[A.C.] was looking for paperwork in [Mother's] room about the case like she had to study it or re-read it, and that stood out to me because something like this happens [the alleged rapes], you don't have to study something like that." (*Id.* at p. 465.) On cross-examination, J.C. described the paperwork as a "booklet," but conceded she did not read the booklet and could not attest to its contents. (*Id.* at p. 468-469.)

**{¶44}** At the beginning of Grandmother's testimony, defense counsel asked Grandmother to "introduce us to [Appellant.]" (*Id.* at p. 473.) Grandmother responded, "[w]ell, Appellant is a good dad. He's a great – I mean, he's never been in trouble before. I mean, he's always been there for me." (*Id.*)

**{¶45}** Two of Grandmother's daughters (Mother and one of A.C.'s aunts) also fostered children. According to Grandmother's direct testimony, her residence was a meeting place for her family and children fostered by her family, as well as the location for holidays and family celebrations. Grandmother testified the ready availability of food and fun also made her residence a popular destination for children in the neighborhood. Defense counsel asked, "[s]o your place is a safe place, right?" Grandmother responded, "[y]es, it is." (*Id.* at p. 476.)

**{¶46}** At the conclusion of Grandmother's direct testimony, a sidebar was held at the request of the state outside of the presence of the jury. The state argued Grandmother's direct testimony "opened the door" to evidence that the state conceded

was inadmissible in its state's case-in-chief. Specifically, the state argued Grandmother's averment that her home was a "safe place" for children opened the door to evidence that Grandmother had provided condoms for Appellant to facilitate sexual relationships with two foster girls, while the respective couples were cohabitating in Grandmother's home. According to the state, Grandmother divulged Appellant had sexual relationships with "multiple foster children in her home" during an interview with Officer Jankowski. (*Id.* at p. 489.) The state further argued Grandmother's direct testimony that Appellant had not been in trouble prior to A.C.'s accusations opened the door to a misdemeanor possession of marijuana charge pending against Appellant in municipal court.

**{¶47}** Specifically, the state argued:

I don't know a person on planet earth that would think that would be a safe house for foster children. I think it would be appalling for any member of the community to think that children are being placed in homes and that is where individuals are having sexual conduct with them.

(*Id.*)

**{¶48}** The state continued:

Another thing [Grandmother] mentioned is that [Appellant has] never been in trouble before. That's not accurate. [Appellant], while this may not be something that would be admissible even on cross-examination of the defendant, the fact that she said he's never been in trouble before is not true. He has a misdemeanor drug charge out of Campbell.

(*Id.* at p. 489-490.)

**{¶49}** Defense counsel conceded his error stating, "I will be the first to say that I asked the question probably wrong [sic] when I said so your place is – house is a safe place. I was trying to get her to open up, and that was definitely a mischaracterization on my part." (*Id.* at p. 490.)

**{¶50}** Defense counsel warranted Grandmother "would probably talk and tell all about [E.]." (*Id.*) He explained that Grandmother asked CSB to remove E. immediately

after Grandmother learned of E.'s sexual relationship with Appellant. According to defense counsel, Grandmother "threw up her arms" and bought condoms when CSB failed to remove E.

{¶51} With respect to the second foster, X.B., defense counsel told the trial court, "[t]here were allegations made, and they were actually unsubstantiated. There was a relationship. Both [X.B.] and [E.], no charges. There's no – there's nothing there." (*Id.* at p. 491.) Later, the state argued, "just because something was not charged does not mean it didn't happen because when [Grandmother] spoke to Officer Jankowski, [Grandmother] said that she believed that the two of them were having sex. That's what she said, and that's what she would be cross-examined about [sic]." (*Id.* at p. 493.)

{¶52} Defense counsel explained Grandmother contacted CSB immediately upon discovering Appellant's relationship with X.B., and CSB did promptly remove X.B. Defense counsel continued, "it's a rabbit hole that, I mean, if the state wants to go down, then I – well, obviously I would object because it would bring in sexual nature. I mean, [Grandmother] or [Appellant] would probably be more than willing to talk about it." (*Id.* at p. 492.)

{¶53} Next, defense counsel conceded he "cringed the second [Grandmother] said [Appellant was a good boy] because you don't say those things. You can't put a hardline statement on there. So I completely understand that one. I think that's a wise thing for the state to be allowed to definitely pursue . . ." (*Id.*)

{¶54} The trial court permitted cross-examination by the state on both topics, reasoning:

> So based upon her initial statement in response to the question the safe house [sic], she did expand to say that many people went there, quite frankly whether she knew them or not, and certainly a picture was painted to the jury as it relates to that home. I do believe that a door was open[ed] that would enable the state to cross examine on some of the statements that this witness gave to Officer Jankowski. I would certainly caution counsel as it relates to how far down that rabbit hole might go, but I certainly think some inquiry is permissible. And certainly [defense counsel] has indicated

that a door has been open[ed] relative to the ability of the state to question this witness as it relates to the charges in Campbell.

(*Id.* at p.493- 494.)

**{¶55}** Defense counsel placed a standing objection on the record to any testimony regarding Appellant's prior sexual history. He argued the state should be permitted to cross-examine Grandmother with respect to the sexual relationships occurring within her household, but the identities of the parties should not be disclosed so as not to run afoul of the rape-shield law:

> I want to preserve with the rape shield part of it because I think that the state could ask questions in a way that it wouldn't be specific as to who was having sex in the household but that there were – because she actually classified [Appellant] as one of her foster children at one point during that when she said I had my five foster children. Because she does classify – I mean, technically he was a foster; I mean while though it was blood. So I mean, whether it was some of the foster children were having sex in her household and she purchased condoms because CSB wouldn't get them out. I mean, if you wanted to stay on the safe side of the rape shield or you want to go all the way.

(*Id.* at p. 494-495.)

**{¶56}** The state countered that Grandmother characterized her house as "a safe house" and Appellant as "a perfect child," so she opened the door "to the questions about [Appellant] specifically and what he was doing." (*Id.* at p. 495.) The trial court responded, "whether she is enabling him out there or whether or not your ability to cross-examine her on potentially issues that would violate the rape shield law are two different things." (*Id.*)

**{¶57}** The state replied, "it's important that it be questioned specifically as it relates to [Appellant] and E., because if [Grandmother] denies making the statement to Officer Jankowski, she can then be cross examined, and it was specific as to those two individuals." (*Id.* at p. 496-497.) The trial court agreed, then acknowledged defense

counsel's standing objection to cross-examination of Grandmother "as it relates to anything . . . regarding the safe house . . . and specifically as to any sexual activity of [Appellant.]" (*Id.* at p. 497.)

**{¶58}** Defense counsel did not challenge the prejudicial nature of the proposed testimony. As a consequence, the trial court did not engage in any prejudice-versus-probative value analysis.

**{¶59}** On cross-examination, Grandmother testified the responsibilities of a foster parent are to provide a safe home, food, clothing, and shelter. The state asked, "[s]afe from unwanted activity?" Grandmother responded, "[s]afe from everything." (*Id.* at p. 504.)

**{¶60}** The state asked, "going back to 2019, who was living at your home at that point?" Grandmother responded, "2019? . . . there's so many kids. I'm going to say [Z.B.], [E.B.] and [X.W.]" (*Id.)* Specifically, the state asked if E. was living with Grandmother, and she responded that she thought E. lived with her in 2018.

**{¶61}** The state asked, "when you spoke to Officer Jankowski, did you tell her that [E.] and [Appellant] were having sexual intercourse?" Grandmother responded, "Yes, I did. They had a relationship." The state continued, "[a]nd you bought them condoms?" Grandmother replied the caseworker told her, "maybe you should get them some protection and put cameras all over your house," but Grandmother specifically denied supplying condoms to the couple. (*Id.* at p. 506.)

**{¶62}** Grandmother further testified X.B. lived in her home after CSB removed E. due to her relationship with Appellant. (*Id.* at p. 507.) Grandmother acknowledged Appellant and X.B. also had a sexual relationship, which she likewise promptly reported to CSB. Grandmother testified, "the county knew and I knew. So they both teenagers [sic], they both had a relationship." According to Grandmother, the caseworker instructed Grandmother to prevent the couple from "sneak[ing] in their rooms" and Grandmother responded that she "[does] have to sleep at night." (*Id.* at p. 518.) Grandmother was instructed for a second time to install video cameras throughout her home.

**{¶63}** When asked if she would like to reconsider her characterization of her residence a "safe house," she responded, "it is a safe house. If you report everything and document everything that happens in a house, it's called a safe house." (*Id.* at p. 509.)

The state responded, "[s]o just to be clear, people are being taken into foster care, being placed in your home, and they're being – and family members of yours are having sex with them?" Grandmother replied, "No, it was just two relationships." (*Id.* at p. 508.)

**{¶64}** Next, the state observed, "[y]ou also said that [Appellant] has never been in trouble before." Grandmother responded, "[b]ig cases? No. Pulled over by – no license and weed, yes." The state replied, "[s]o the misdemeanor drug charges that he had, that's not being in trouble?" Grandmother responded, "[n]o, that means trouble, but I'm talking about like major like, you know, big stuff." (*Id.*)

**{¶65}** Despite the fact that the foregoing evidence was offered solely for the purpose of contradicting Grandmother's direct testimony, no limiting instruction was requested or provided to the jury. Just the opposite, the state encouraged the jury during closing argument to consider Grandmother's testimony on cross-examination as evidence of Appellant's guilt:

> [Grandmother] is the definition of an enabler. My God, the things you heard on the stand, the two other foster children and now [A.C.]. She is an enabler. That's what she does. That's why he gets to take advantage of women because there's somebody in his life that just covers up for him, just let it go, (indicating), not a big deal. It's a safe house. I mean, that's the most ridiculous thing that I heard in the course of this trial, it's a safe house. The idea that we're sending foster children into homes and they're having sex with people that live there and that's supposed to be a safe house? I mean, ladies and gentlemen, that is not a safe house. That's a house of horrors.

(*Id.* at p. 583.)

**{¶66}** During deliberations, the jury asked five questions. The first question read in its entirety, "[h]ow old were the two foster kids he had sex with." In response, the trial court instructed jurors to "rely on [their] collective memories as it relates to the testimony from the witnesses." (*Id.* at p. 612.) There was no testimony establishing Appellant's age or the age of the two girls when the respective sexual relationships occurred.

**{¶67}** Appellant was convicted of both counts of rape and sentenced to a minimum term of ten years and a maximum term of life on each count, to be served concurrently. This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN ALLOWING THE STATE OF OHIO TO QUESTION A THIRD-PARTY WITNESS ABOUT UNSUBSTANTIATED AND UNCHARGED PRIOR SEXUAL HISTORY OF [APPELLANT].**

**{¶68}** Appellant's challenge to the admission of Grandmother's testimony on cross-examination requires the interpretation of the rules of evidence regarding impeachment by cross-examination and character evidence, and the rape-shield law. The credibility of a witness may be attacked by any party. Ohio Evid.R. 607. Further, a witness' testimony may be impeached by self-contradiction. Ohio Evid.R. 613.

**{¶69}** Character evidence, on the other hand, is limited by Evid.R. 404(B), which reads:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Nonetheless, Evid.R. 405(A) permits inquiry into relevant specific instances of conduct on cross-examination to challenge the opinion of a character witness. *State v. Jackson*, 57 Ohio St.3d 29, 39 (1991) (because the defendant's girlfriend testified about defendant's character, the prosecutor could cross-examine her about specific instances of conduct).

**{¶70}** Finally, Ohio's rape-shield law protects both the accuser and the defendant from the admission of evidence of prior sexual activity. The prohibition is contained in R.C. 2907.02, the statute defining the crime of rape, and reads in relevant part:

Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code [to prove motive], and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

R.C. 2907.02(D) (incorporating the mandatory exclusion of prejudicial evidence codified in Ohio Evid.R. 403(A)).

{¶71} A defendant can waive the statutory prohibition against the admission of specific instances of prior sexual activity where he "opens the door" to the issue of prior sexual activity into the case. *State v. Howell*, 2020-Ohio-821, ¶ 29 (2d Dist.); *State v. Howton*, 2017-Ohio-4349, ¶ 29 (3d Dist.); *State v. Fannin*, 1999 WL 402231 (4th Dist. June 11, 1999); *State v. Gauntt*, 1993 WL 389470 (8th Dist. September 30, 1993); *State v. Chojnacki*, 1994 WL 721918 (9th Dist. Dec. 30, 1994); *State v. Varner,* 1998 WL 683943 (11th Dist. Sept. 25, 1998); *State v. Bozeman*, 2009-Ohio-3677, ¶ 49-50 (12th Dist.). Moreover, when a defendant in a rape case "opens the door" by referencing his or her character or past behavior, the prosecution "may call as rebuttal witness individuals who have observed a defendant engage in acts that were inconsistent with his assertions." *State v. Hardie*, 2004-Ohio-6783, ¶ 21 (2d Dist.), citing *State v. Agner*, 135 Ohio App.3d 286, 293 (3d Dist.1999); *State v. Banks*, 71 Ohio App.3d 214, 219-220 (3d Dist. 1991), citing *Holt v. State*, 107 Ohio St. 307, 318 (1923).

{¶72} Case law admitting evidence regarding the defendant's prior sexual conduct as a consequence of "opening the door" has been largely predicated upon two types of testimony. First, abject or broadly-worded denials of the charged conduct by the defendant (*i.e.,* "I have never touched my daughter inappropriately" or "I would never hurt a child"); and/or second, testimony offered by a defense witness that the charges are inconsistent with the defendant's good character.

{¶73} For instance, in *State v. Banks, supra,* Banks testified on direct examination that he had never had sexual contact with his daughter or any children under the age of eighteen. On rebuttal, the state offered the testimony of two witnesses, Banks' step-daughter and the daughter of Banks' girlfriend. Both rebuttal witnesses testified Banks touched them inappropriately when they were small children. Because Banks raised the issue of sexual contact with other family members, the Third District concluded he opened the door to the otherwise-inadmissible evidence:

> In the case before us, the defendant, in his case-in-chief, interjected the issue of his prior sexual acts into the case. Consequently, as the defendant elected to rely upon the absence of prior acts of sexual misconduct or "perversion" as a defense in his case-in-chief, the state was entitled to introduce testimony in rebuttal to meet the defense interposed by the defendant. "[T]he state is not to be deprived thereof simply because it might tend to further establish the elements of the crime charged." *Holt v. State* (1923), 107 Ohio St. 307, 140 N.E. 349.

*Banks*, 71 Ohio App.3d 214 at 219-220.

{¶74} Similarly, in *State v. Hardie*, the Second District concluded rebuttal testimony contradicting Hardie's direct testimony in his case-in-chief that he had never touched the victim inappropriately, as well as the testimony of his sister that his relationship with the victim was "very loving" and "very patient" was admissible. The state called three rebuttal witnesses, who testified to sexual conduct occurring between Hardie and the victim in public (licking, rubbing, fondling, and kissing on the lips). *Hardie*, 2004-Ohio-6783, at ¶ 21 (2d Dist.).

{¶75} Likewise, in *Bozeman,* Bozeman testified on direct that he "would never [rape] any child." The Twelfth District observed, "[i]n making this sweeping statement during his case-in-chief, [Bozeman] himself interjected the issue of his character into the case. Consequently, [Bozeman] 'opened the door' to rebuttal evidence on the issue, including evidence of previous sexual misconduct with other children." *Bozeman*, 2009-Ohio-3677, at ¶ 49 (12th Dist.).

{¶76} In *State v. Carpenter*, 2023-Ohio-2523 (12th Dist.), the Court opined the introduction of testimony by two defense witnesses that the criminal charges were inconsistent with Carpenter's good character, opened the door to rebuttal evidence regarding Carpenter's use of pornography. However, the trial court limited the rebuttal evidence to the subject of Carpenter's use of pornography because it had already been raised during the trial. *Id.* at ¶ 72.

{¶77} In addition to the substantive challenge substance to the rebuttal testimony, Hardie raised a Rule 403 challenge, alleging the admission of his prior acts was more prejudicial than probative. The Second District disagreed based on two limiting instructions given to the jury that the evidence by the rebuttal witnesses was not to be considered as proof that Hardie committed the underlying offenses, coupled with the presumption in Ohio that a jury follows the trial court's instructions.

{¶78} Trial courts have discretion over the admission or exclusion of evidence. *State v. Sage*, 31 Ohio St.3d 173, (1987), paragraph two of the syllabus. Abuse of discretion connotes the decision of the trial court is unreasonable, unconscionable, or arbitrary. "An abuse of discretion includes a situation in which a trial court did not engage in a 'sound reasoning process'. Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." (internal citations omitted) *State v. Darmond*, 2013-Ohio-966, ¶ 34, quoting *State v. Morris*, 2012-Ohio-2407, ¶ 14.

{¶79} In formulating the standard of review for improperly-admitted evidence in the criminal context, the Ohio Supreme Court has observed, "while courts may determine prejudice in a number of ways and use language that may differ, they focus on both the impact that the offending evidence had on the verdict and the strength of the remaining evidence." *State v. Morris*, 2014-Ohio-5052, ¶ 25. The *Morris* Court continued, "[b]oth the error's impact on the verdict and the weight of the remaining evidence must be considered on appellate review." *Id.*

{¶80} Specifically, the *Morris* Court wrote:

> Erroneous admission of Evid.R. 404(B) evidence is a singular problem. "Prosecution evidence that a defendant has committed other crimes, wrongs or acts independent of the offense for which he is on trial is

not generally admissible to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts." *State v. Mann*, 19 Ohio St.3d 34, 482 N.E.2d 592 (1985), paragraph one of the syllabus. The question is whether an improper admission affects the defendant's "substantial rights" so that a new trial is required as a remedy. Several principles emerge from our cases.

First, there must be prejudice to the defendant as a result of the admission of the improper evidence at trial. "[A] judgment of conviction should not be reversed because of 'the admission . . . of any evidence offered against . . . the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby.' " [*State v.*] *Crawford*, 32 Ohio St.2d at 255, 291 N.E.2d 450, quoting R.C. 2945.83(C). Compare *State v. Abrams*, 39 Ohio St.2d 53, 56, 313 N.E.2d 823 (1974) (same requirement in considering improper judge-jury communications).

Second, an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt. *Id.*; *Crawford*; *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Bayless*, 48 Ohio St.2d 73, 106, 357 N.E.2d 1035 (1976), vacated in part on other grounds, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978); accord *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus ("Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction"), vacated in part on other grounds, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

Third, in determining whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence. In a case dealing with the improper admission of privileged spousal testimony, we

stated that " 'the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.' " *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5. But in reviewing the remaining evidence, we cautioned, "We are also mindful that our role upon review of this case is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury." *Id.* at fn. 4.

*Morris* at ¶ 26-29.

**{¶81}** Finally, the *Morris* Court further observed, "blatant prejudice may override even a strong case and require a new trial." *Id.* at 32. However, "an improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." *Id.*, citing *State v. Williams*, 6 Ohio St.3d 281, 290 (1983). Criminal Rule 52(A), captioned "Harmless Error," reads in its entirety, "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

**{¶82}** Turning to the above-captioned case, the state sought to introduce evidence of Appellant's sexual relationships with the two foster girls in Grandmother's care in order to impeach Grandmother's direct testimony that her home was a safe place for children. To the extent that Grandmother's testimony regarding Appellant's sexual relationships with E. and X.B. were offered as prior inconsistent statements, we agree with the trial court that Grandmother's testimony on cross-examination was relevant and probative of the issue of the safety of her home. However, the trial court failed to consider whether the prejudicial effect of the proposed testimony outweighed its probative value.

**{¶83}** Given the inflammatory nature of Grandmother's testimony on cross-examination, coupled with the dearth of evidence in the record regarding the foster girls' ages and Appellant's age during the sexual relationships, we find the trial court abused its discretion in admitting the testimony. In addition to being prejudicial, Grandmother's cross-examination testimony plainly violated the rape shield law. Grandmother's direct

testimony regarding the safety of her home did not open the door to Appellant's sexual history, as Grandmother's direct testimony neither raised the issue of Appellant's sexual history nor suggested the rape charges were inconsistent with Appellant's good character.

**{¶84}** It was Grandmother's character, rather than Appellant's, at issue due to her prior inconsistent statements. As suggested by defense counsel, the trial court could have tailored the evidence to admit testimony regarding the sexual relationships occurring in Grandmother's home without specifically identifying Appellant as a participant. The tailored evidence would have served its limited purpose – to contradict Grandmother's direct testimony – without violating Appellant's statutory right under the rape shield law.

**{¶85}** Of equal concern is the absence of a limiting instruction to the jury accompanying Grandmother's cross-examination testimony. Such an instruction would have advised the jury to consider Grandmother's cross-examination testimony solely for the purpose of impeaching her direct testimony, and prohibited the jury from considering Appellant's sexual relationships with the foster girls as evidence of his guilt in accordance with Ohio law.

**{¶86}** The state further exacerbated the problem in its closing argument. The state specifically urged the jury to engage in the prohibited use of Grandmother's testimony on cross-examination, that is, "to prove the character of [Appellant] in order to show that he acted in conformity therewith." R.C. 2907.02(D) and Ohio Evid.R. 404(A).

**{¶87}** Accordingly, we find the trial court abused its discretion in admitting Grandmother's testimony regarding Appellant's sexual relationships with E. and X.B. However, the trial court's admission of prejudicial evidence does not end our analysis. Next, we consider whether the wrongly-admitted evidence was harmless beyond a reasonable doubt. As instructed by *Morris,* 2014-Ohio-5052, we excise the offending testimony and consider the remaining evidence in the record, in order to determine whether there exists overwhelming evidence of Appellant's guilt.

**{¶88}** A.C., who was eighteen years of age when she testified, provided compelling testimony, which was supported by the testimony of the other witnesses for the state. For instance, LeFlore, the outcry witness, explained the reason for A.C.'s delayed disclosure. According to LeFlore, A.C. confided she had been "holding it in," but

did not know "how to deal with it anymore." A.C. was worried about "tearing apart the family," and had prioritized "everybody else's feelings" above her own. A.C. told LeFlore that A.C. did not have the courage to tell Mother because A.C. was embarrassed.

{¶89} With respect to the veracity of A.C.'s testimony, Wilson testified A.C. demonstrated no evidence of coaching, as A.C. provided experiential details of the rape. Malmer concluded A.C.'s examination was "highly concerning for child sexual abuse." Further, Blakeley-Clutter described A.C.'s disclosure as an "aha!" moment, as it provided an explanation for the failure of her previous therapy for attachment disorder.

{¶90} The only evidence arguably supporting Appellant's version of the facts was Mother's concession on cross-examination that she confiscated A.C.'s mobile telephone at least once as a punishment many months prior to A.C.s' disclosure. Mother's testimony bolstered Appellant's testimony that A.C. expressed a willingness to do anything for a mobile telephone and marijuana around the same time the rapes occurred.

{¶91} However, the foregoing testimony is not exculpatory. Mother's testimony establishes a reason that A.C. might have consented to perform oral sex on Appellant. However, A.C. was incapable of consent due to her age.

{¶92} The only other purpose for the foregoing testimony is to show Appellant did not give A.C. a mobile telephone and marijuana, so there was no quid pro quo, and the rape accusations were manufactured by A.C. as revenge. However, there is no reason an eleven-year-old would withhold false accusations for two years, particularly if they were retribution for Appellant's failure to provide her with marijuana and a mobile telephone. It is unreasonable to suggest A.C. was so angry with Appellant that she fabricated rape accusations, but waited two years before exacting her revenge.

{¶93} Finally, Appellant offered no explanation for his failure to tell Grandmother and/or Mother the alarming news that his eleven-year-old cousin was willing to perform oral sex in exchange for a mobile telephone and marijuana. Appellant testified that it was "weird", so he did not warn any adult of A.C.'s dangerous behavior.

{¶94} In summary, we find the trial court abused its discretion in admitting Grandmother's testimony regarding Appellant's sexual relationships with E. and X.B. The probative value of the evidence, offered to impeach Grandmother's direct testimony that her home was safe for children, was outweighed by its inflammatory nature. Further, no

effort was made to limit the prejudicial impact of the testimony. Nonetheless, we find the remaining evidence in the record constitutes overwhelming evidence of Appellant's guilt. Accordingly, we find Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

## THE TRIAL COURT ERRED IN ALLOWING A CONVICTION DESPITE INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶95} To establish a claim of ineffective assistance of counsel, a defendant must show both his trial counsel's performance was deficient, as it fell below an objective standard of care, and the deficient performance resulted in prejudice. *State v. Bradley*, 42 Ohio St.3d 136, 141-143 (1989), citing *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Lyons*, 2015-Ohio-3325, ¶ 11 (7th Dist.), citing *Strickland* at 694.

{¶96} Appellant must affirmatively prove counsel's ineffectiveness and that prejudice occurred. *Id.* at 693. If the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶97} Licensed attorneys in Ohio are presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). In evaluating trial counsel's performance, appellate review is highly deferential because of the strong presumption counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689.

{¶98} Appellant contends defense counsel's performance was deficient in two respects: First, defense counsel should have hired an expert witness on delayed disclosure. Second, defense counsel should not have called Grandmother to testify. Specifically, Appellant challenges defense counsel's decisions to ask if Grandmother's house was a safe place for children and his invitation to Grandmother to offer testimony regarding Appellant's good character.

Case No. 24 MA 0076

{¶99} Appellant cites the Ohio Supreme Court's decision in *State v. Bunch*, 2022-Ohio-4723, for the proposition that defense counsel was deficient because he did not hire an expert on delayed disclosure. In that case, Bunch alleged in a post-conviction petition that his trial counsel should have hired an expert on eyewitness identification. The Supreme Court remanded the matter for an evidentiary hearing on the petition, but expressed no opinion on the merits of Bunch's claim.

{¶100} When the core of the state's case against a defendant involves evidence that the jury cannot properly understand without the assistance of expert testimony, the failure to engage a competent expert can constitute deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 273 (2014). And when the core of a defendant's claim or defense turns on evidence that cannot be properly provided to a jury without the use of expert testimony, the failure to engage experts can also constitute deficient performance. *State v. Herring*, 2014-Ohio-5228, ¶ 73-79, 80.

{¶101} The Ohio Supreme Court predicated its remand in *Bunch* on two facts not present in the current appeal. First, Bunch's original trial counsel successfully moved the trial court for funds to hire an expert regarding eyewitness identification. Despite the availability of funding, Bunch's subsequent attorney did not hire an expert. Further, the state did not offer an expert on eyewitness identification. The Supreme Court remanded the matter for an evidentiary hearing because Bunch's attorney had no opportunity to present any evidence regarding eyewitness identification.

{¶102} Next, the Supreme Court in *Bunch* relied on the difference between ineffective assistance claims asserted on direct appeal versus ineffective assistance claims asserted in a post-conviction petition:

> We have repeatedly held that direct appeals are not the appropriate place to consider allegations of ineffective assistance of trial counsel that turn on information that is outside the record. *See* [*State v.*] *Hartman*, 93 Ohio St.3d [274] at 299, 754 N.E.2d 1150; *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000); *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997); *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 75. Because we cannot consider information outside the record in a direct appeal, we must often conclude that a defendant's claims are

speculative. *Hartman* at 299, 754 N.E.2d 1150; *Foust* at ¶ 98. And speculation alone cannot overcome "the 'strong presumption' that counsel's performance constituted reasonable assistance." *Foust* at ¶ 89, quoting *State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373 (1989).

*Bunch,* 2022-Ohio-4723, at ¶ 35.

**{¶103}** Here, defense counsel had the opportunity to cross-examine Malmer regarding delayed disclosure. As a consequence, Appellant was not foreclosed from eliciting testimony on the subject. Of equal import, Appellant's ineffective assistance claim in this appeal turns largely on his speculative argument that an expert on delayed disclosure could have altered the outcome of his trial. Because Appellant was able to cross-examine the state's witness on delayed disclosure, and Appellant's ineffective assistance claim cannot be established based on the evidence in the record, we find Appellant's second assignment of error based on defense counsel's failure to hire an expert on delayed disclosure is without merit.

**{¶104}** Next, Appellant argues defense counsel was deficient for calling Grandmother to testify. At oral argument, Appellant asserted there was no strategic value to Grandmother's testimony, other than as a "character builder." Specifically, Appellant challenges defense counsel's decision to elicit testimony that Appellant had not been in any trouble prior to the charges in this case, and Grandmother's house was a safe place for children.

**{¶105}** Appellant argues Grandmother's testimony on cross-examination that introduced his pending misdemeanor charge for marijuana possession caused outcome determinative prejudice. Appellant reasons that the testimony established his possession of marijuana, which bolstered A.C.'s testimony that he plied her with marijuana in order to compel her to perform oral sex and blackmail her. As we have concluded the remaining testimony establishes overwhelming evidence of Appellant's guilt, we find Appellant cannot establish the outcome of his trial would have been different but for the introduction of his pending misdemeanor drug charge. The same is true with respect to Appellant's ineffective assistance claim predicated upon Grandmother's testimony that her home was a safe place for children. After excising the offending testimony, we have found the

remaining evidence constitutes overwhelming evidence of Appellant's guilt. Insofar as Appellant cannot establish the prejudice prong of the *Strickland* test, we find his second assignment of error as it relates to Grandmother's testimony on cross-examination has no merit.

## CONCLUSION

**{¶106}** For the foregoing reasons, Appellant's convictions are affirmed.


Waite, J., concurs.

Hanni, J., dissents with dissenting opinion.

Hanni, J., dissenting.

**{¶107}** With regard and respect to my colleagues, I must dissent from the majority opinion. I would find that the admission of Grandmother's testimony regarding Appellant's sexual activity with two foster children in her house was so highly prejudicial to Appellant that it could not constitute harmless error as the majority concludes. I would reverse Appellant's conviction and remand the matter for a new trial.

**{¶108}** Ohio's rape-shield law protects both the accuser and the defendant from the admission of evidence of any prior sexual activity. Specifically,

> [e]vidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and *only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value*.

(Emphasis added); R.C. 2907.02(D).

**{¶109}** The majority does conclude that the trial court abused its discretion in admitting Grandmother's testimony regarding Appellant's sexual activity with two foster children in her care. But it goes to find this error was harmless beyond a reasonable doubt given the rest of the evidence establishing Appellant's guilt.

**{¶110}** Grandmother's testimony on cross-examination was manifestly prejudicial to Appellant. Rather than simply impeaching Grandmother's direct testimony, the State used her testimony on cross-examination to characterize Grandmother as an "enabler" and Appellant as a molester of foster girls placed in Grandmother's home, even though there was no evidence that the foster girls were underage or their sexual relationships with Appellant were nonconsensual. Moreover, the trial court did not provide the jury with an instruction limiting their consideration of this evidence to Grandmother's credibility. In

Case No. 24 MA 0076

fact, the State encouraged the jury to consider this evidence in considering Appellant's character and actions.

**{¶111}** While recognizing that an improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error when the remaining evidence is overwhelming, the Ohio Supreme Court has stated that blatant prejudice may override even a strong case and require a new trial. *State v. Morris*, 2014-Ohio-5052, ¶ 32. I would find in this case that Grandmother's testimony regarding Appellant's sexual escapades with foster children in her home resulted in blatant prejudice to Appellant, which requires a new trial.

[Cite as *State v. Gonzalez*, 2025-Ohio-1314.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**